# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN JUDICIAL DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION
## Case No. 7:09-cv-89 (BO)

**CAMILLA AND KEITH THOMPSON, EDWARD NICKLAS, JR., JANICE ARNOLD, TRACY GLANTON, NEIL AND LORETTA WADHWA, CHARLES AND DONNA NEWMAN, WILLIAM AND KATIE GLANTON, ERNEST BERNER, LEE CASLAVKA, RICHARD AND NANCY JANSSON, BRUCE AND SONYA PATTERSON, JEFFREY MORGAN, BRIAN AND SHANNON TULLY, ROBERT KILPATRICK, JASON KEEFER, TOBEY TOLBERT, MICHAEL RICHARDS, JR., MICHELLE NEIHAUS, AURENA RAINES, DORIS HOTTEL, MICHAEL AND SHERRY JETT, RICHARD AND BETTY GREEN, ROBERT AND ANNETTE MCKEAG, STEWART ELLIS, ELIZABETH PEREIRA, PHYLLIS AND EDMOND CRAGER, THEODORA BASSE, ROGER AND CATHY JONES, KIMBERLY GRAHAM, FELICIA BARNES, MICHELLE FOX, CHRISTIAN DOWNWARD, SAHR ALPHA-K, CHRISTOPHER LAROSE, MARIE AND MARK JUDGE, YIM SIGUA, JANICE GRAY, NICKOLAS KATSAKIS, EMMA AND HAROLD JONES, JOSEPH AND CATHERINE SEEBALD, JOSEPH AND MARILYN BAWOL, MARK AND DIANE TUDOR, MATTHEW SCHOOLFIELD, DAVID S. LEWIS, JR., JEFFREY P. GNIADEK, CYNTHIA WILSON, MARK MARTINO, JULIE A. BARTLETT, DARYL AND LORNA BASSE, PAUL H. AND BARBARA BLAKEMAN, ERIN BLYSTONE, ROBBIE L. AND JEROME S. CULLEN, MICHAEL T. AND ANITA E. FORD, GEORGE AND CINDY GRUNBAUM, ANH T. AND TOAN Q. NGO, LEO N. AND KAREN DIONISIO, WILLIAM AND TERESA ELLIOTT, WILLIAM S. FRASSINETI, STEVEN AND HOLLY SHANNON, PATRICK TONKINSON, JAMES OLIVER, MARK SMITH, ESTER LOPES, STEVEN GILFORD, DORA AND JOHN EMIG, JR., AND DIANE CHIARAVALLOTI AND PHILLIP STEPHENSON,**

Plaintiffs,

vs.

**BANK OF AMERICA**, a North Carolina corporation; **CAROLINA FIRST BANK**, a Florida corporation; **SUBURBAN FEDERAL SAVINGS BANK, n/k/a BANK OF ESSEX,** a Virginia

corporation; **RBC BANK (USA)**, a North Carolina corporation; **BRANCH BANKING AND TRUST COMPANY OF SOUTH CAROLINA,** a South Carolina corporation; **WOODLANDS BANK,** a South Carolina corporation; **COOPERATIVE BANK FOR SAVINGS, INC.,** a North Carolina corporation, n/k/a **FIRST BANK**; **MACQUARIE MORTGAGES USA, INC.,** a Florida corporation; **SUNTRUST BANKS, INC.** a Georgia Corporation, **WACHOVIA CORPORATION N/K/A WELLS FARGO, MARK DAIN,** an individual; **MICHAEL MCCRACKEN,** an individual; **AARON HERNANDEZ,** an individual d/b/a **METROPOLITAN INVESTMENT GROUP** and/or **FIRST METRO MORTGAGE PETER NEATHERY,** an individual d/b/a **METROPOLITAN INVESTMENT GROUP** and/or **FIRST METRO MORTGAGE**; **R.A. NORTH DEVELOPMENT, INC.,** a North Carolina corporation; **R.A. NORTH DEVELOPMENT I, INC.,** a North Carolina corporation; **RANDOLPH ALLEN,** an individual; **COASTAL REALTY GROUP, LLC,** a South Carolina limited liability company; **JOHN BODEN,** an individual; **SOUTHEASTERN WATERFRONT MARKETING INC.,** a North Carolina corporation; **RICHARD MACE WATTS, JR.,** an individual; **WILLIAM ALLEN,** an individual; **PREMIER REALTY MANAGEMENT LLC**, a South Carolina limited liability company; **SCOTT BROGAN,** an individual; **PROVIDENCE GLOBAL FINANCE & TECHNOLOGY, LLC**, a Virginia limited liability company; **CANNONSGATE AT BOGUE SOUND HOMEOWNERS ASSOCIATION, INC.** a North Carolina corporation; **SUMMER HOUSE HOMEOWNERS ASSOCIATION, INC.,** a South Carolina corporation; **CRAVEN'S GRANT HOMEOWNERS ASSOCIATION, INC.,** a South Carolina corporation; **MARYVILLE PARTNERS, INC,** a South Carolina corporation; **BERTHADALE R. BEST,** an individual; **JAMES S. WAGONER,** an individual; **EMILY L. ADAMS,** an individual; **JENNIFER C. PARKER,** an individual; **JOHN TODD** an individual; **ALAN SULLIVAN**, an individual;

Defendants.

**JOHN S. O'CONNOR**
Attorney for Plaintiffs
THE O'CONNOR LAW FIRM, PLLC
309 S. Laurel Avenue, Suite 100
Charlotte, NC 28207
John@joconnorlaw.com
Phone: 704.919.1885
State Bar No. 37832

**DAVID A. BINKLEY**
**JASON A. SWITZER**
Attorneys for Plaintiffs
GIARMARCO, MULLINS & HORTON, P.C.
Tenth Floor Columbia Center
101 W. Big Beaver Road
Troy, Michigan 48084-5280
Phone: 248.457.7000
LR 83.1 Counsel

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, by counsel John S. O'Connor and David A. Binkley, appearing by way of LR 83.1, submit this Second Amended Complaint against the Defendants, and in support thereof, state as follows:

## INTRODUCTION AND EXECUTIVE SUMMARY OF PLAINTIFFS' CLAIMS

1.      This is an action for damages and rescission arising out of the sale of real property to the Plaintiffs by all Defendants acting in concert with one another in an elaborate and fraudulent scheme.  This Complaint seeks relief under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §1701, *et seq.*, the North Carolina Deceptive Trade Practices Act, N.C. GEN. STAT. §75-1 *et seq.*, the South Carolina Deceptive Trade Practices Act, S.C. Code Ann. §39.5.140, common law fraud, fraud in the inducement, constructive fraud, breach of fiduciary duty, negligent misrepresentation, violation of the North Carolina Mortgage Lending Act, N.C. GEN. STAT. §53-243, violation of the South Carolina Licensing Requirements Act, S.C. CODE ANN. §40-58-10 civil conspiracy to commit fraud, malpractice, negligence and relief under the Declaratory Judgment Act, 28 .S.C. §2201, *et seq.* (2009).

2.      Beginning in early 2006, the Defendants acted together in various combinations to fraudulently induce the Plaintiffs to purchase property using high pressure, clearly false sales

tactics, rigged appraisals and promises of early return on investments. The scheme was fueled by the greed of the Defendants and their employees and a commission arrangement that compensated Lender Defendants on the basis of origination and servicing of such loans. While the scheme was not new, it was clearly fraudulent and in violation of a host of civil and criminal statutes designed to protect consumers such as the Plaintiffs. Each Defendant played an important role in the overall success of the fraud. Throughout this Complaint, Plaintiffs will identify a host of complicit parties beginning with the Lender Defendants, the Developer Defendants - both corporate and individual - the Appraiser Defendants and the Promoter Defendants - both corporate and individual.

3.     The fraud involves the sale of vacant lots in three new developments, Summerhouse On Everett Bay located in Onslow County and Cannonsgate located in Carteret County are both owned and developed by Defendant RA North Development and RA North Development I. The third development is located in Georgetown, South Carolina, known as Craven's Grant and is owned by Maryville Partners or its assignee Cravensgrant II LLC

4.     The Defendants conspired to lie to the Plaintiffs about the value of the lots through an elaborate, well orchestrated scheme, whereby each Defendant played an important role in the overall success of the plan. In every case, the Defendants sold grossly overpriced property by:

      a.     Soliciting and obtaining false appraisals;

      b.     Falsifying the HUD-1 Settlement Statements;

      c.     Misrepresenting the "financial incentives" to the buyers so as to induce the buyers to purchase lots for minimal investment easy turnover and substantial profits;

      d.     Steering purchasers to select lenders who used corrupt appraisers and who knowingly participated in the overall scheme;

      e.     Falsifying some of Plaintiffs' loan applications;

  f.  Using deceptive and dishonest/false testimonials;

  g.  Using deceptive and false advertising;

  h.  Inventing values for the properties that were impossible to support.

  5.  Throughout Plaintiffs' Second Amended Complaint, references will be made to lots sold from the developer to certain purchasers - not parties to this action - as "fair market value" purchases. For example, in Summerhouse, Defendant RA North had an inventory of 1053 lots at the beginning of the scheme described herein. Initially, RA North, through its marketing division, Southeast Waterfront Marketing, sold lots to a fair market value purchaser who may have been holding the lots for investment or resale, or for a building a home sometime in the future.

  6.  Other purchasers, Plaintiffs herein, did not purchase directly from RA North or Maryville. Instead these individuals purchased their lots from one of the several interim corporate developers - Total Realty Management, Premier Realty Management, Coastal Development, Providence Global Financial or Aaron Hernandez and Peter Neathery d/b/a Metropolitan - who never really owned title to the property in the first place. Instead these interim corporate developers would acquire title from RA North or Maryville and immediately "flip" the property for as much as 2 1/2 times greater using Plaintiffs' funds to pay off RA North and keeping the profits for themselves. Often these excess funds were in excess of $200,000 representing the profit to the interim corporate developer for holding title to property for mere minutes. These flip transactions are described herein as the "fraud" sales.

  7.  In other cases, the interim corporate developers would sell property under these same fraudulent circumstances, to affiliated parties but later buy the property back at 90% of the fraudulent sales price simply to re-flip the property again. The advantage to these multiple flip transactions was two fold. First these sales were recorded sales, at grossly inflated prices, within

the Register of Deeds and used later as comparables to justify future sales at inflated prices. Second, these multiple flip transactions created the impression that the properties were indeed turning over when the truth was that the repurchase was simply a part of the overall scheme to continue to attract new buyers.

8.     The evidence in this case will show that the scheme required the active participation of the Defendant Lenders in order to make the scheme work. The Defendant Lenders actively and deliberately colluded with the appraisers and the Developers to invent phony values for properties, often at the direction of the Developer Defendants many of whom are named as Defendants in their individual capacity.  At all times relevant hereto, the Defendant Lenders, in concert with all of the various developers, their agents, servants and employees, actively manipulated the appraisal process and deceived the Plaintiffs into purchasing the lots in question.

9.     Plaintiffs submit that the time frame for the fraudulent acts, 2006-2007, was a frenzied period of lending when sub-prime, "paper saver" loans, no-document, stated income and other reckless lending practices commonplace.  Plaintiffs submit that the Defendant Lenders were careless about underwriting standards, disregarding their own internal underwriting guidelines and that the culture existing at the time of "easy credit" allowed for little or no scrutiny of the underwriting process.  As a direct and proximate result, the fraudulent acts described herein caused a virtual economic destruction of the value and marketability of these developments by way of massive foreclosures, defaults on existing loans and the inability of any Plaintiff to recover even a fractional share of the price paid for the property just 2-3 years earlier.

10.     Although the Defendants will claim that the current economic recession is the cause of the diminution in value of the developments, the truth is much different.   Other

developments have indeed suffered a diminution in value of their property but the Plaintiffs herein have been deprived of the entire value of their property. Lots that were selling for $329,000 in 2006 cannot be sold at any price because no bank will lend money to acquire property in these developments. Ironically, the banks deem these properties "toxic" because of the huge foreclosure rates and the stigma hanging over each of the developments because of the well known and well publicized fraud caused by these very same banks.

11.     The evidence in this case will further show that the Defendant Lenders believed that the loans made to Plaintiffs had an unusually high probability of failure and took steps to insure those loans with national insurance carriers, including but not limited to Genworth Financial. The evidence will show that upon application for benefits following the collapse of the mortgage loans, Genworth denied coverage because the underwriting for the loans was fraudulent.

## JURISDICTION AND VENUE

12.     This court has jurisdiction pursuant to 28 U.S.C. §1331 and this lawsuit is brought pursuant to the Interstate Land Sales Full Disclosure Act ("ILSA") 15 U.S.C. §1701 *et seq.* This court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367. Venue is proper pursuant to 28 U.S.C. §1391 and 15 U.S.C. §1719.

## PLAINTIFFS

13.     Camilla and Keith Thompson are a married couple and are residents of Baltimore, Maryland. The purchase of their property is described in Exhibit 1. The Thompsons did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on May 21, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

14.    Edward Nicklas, Jr. is an individual and a resident of Alexandria, Virginia. The purchase of his property is described in Exhibit 2. Mr. Nicklas did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

15.    Janice Arnold is an individual and a resident of McDonough, Georgia. The purchase of her property is described in Exhibit 3. Ms. Arnold did not receive a Property Report from any Defendant in connection with the purchase of her lot. Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant Premier and to the Defendant Lender Bank of America.

16.    Tracy Glanton is an individual and a resident of Douglasville, Georgia. The purchase of her property is described in Exhibit 4. Ms. Glanton did not receive a Property Report from any Defendant in connection with the purchase of her lot. Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

17.    Neil and Loretta Wadhwa are a married couple and are residents of Leesburg, Virginia.  The purchase of their property is described in Exhibit 5. The Wadhwas did not receive a Property Report from any Defendant in connection with the purchase of their lots. Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant Hernandez and to the Defendant Lenders Bank of America and Suburban Federal Home Loans.

18.    Charles and Donna Newman are a married couple and are residents of Fredericksburg, Virginia. The purchase of their property is described in Exhibit 6. The Newmans did not receive a Property Report from any Defendant in connection with the purchase of their

lot. Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

19.     William and Katie Glanton are a married couple and are residents of Ocean Isle Beach, North Carolina. The purchase of their property is described in Exhibit 7. The Glantons did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

20.     Ernest Berner is an individual and a resident of Alexandria, Virginia. The purchase of his property is described in Exhibit 8.  Mr. Berner did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

21.     Lee Caslavka is an individual and a resident of Centerville, Virginia. The purchase of his property is described in Exhibit 9.  Mr. Caslavka did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

22.     Richard and Nancy Jansson are a married couple and are residents of Spotswood, New Jersey. The purchase of their property is described in Exhibit 10.  The Janssons did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant Premier and to the Defendant Lender Bank of America.

23.     Bruce and Sonya Patterson are a married couple and are residents of Fork Union, Virginia. The purchase of their property is described in Exhibit 11.  The Pattersons did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on May 21, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

24.     Jeffrey Morgan is an individual and a resident of Mechanicsburg, Pennsylvania. The purchase of his property is described in Exhibit 12.  Mr. Morgan did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant Coastal and to the Defendant Lender BB&T.

25.     Brian and Shannon Tully are a married couple and are residents of Oak Hill, Virginia. The purchase of their property is described in Exhibit 13.  The Tullys did not receive a Property Report from any Defendant in connection with the purchase of their lot.  Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender BB&T.

26.     Robert Kilpatrick is an individual and a resident of Fairfax, Virginia. The purchase of his property is described in Exhibit 14.  Mr. Kilpatrick did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant Coastal and to the Defendant Lender BB&T.

27.     Jason Keefer's purchase is described in Exhibit 15.  Mr. Keefer did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this

Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant Hernandez and to the Defendant Lender BB&T.

28.     Tobey Tolbert is an individual and a resident of Virginia Beach, Virginia. The purchase of his property is described in Exhibit 16.  Mr. Tolbert did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Cooperative Bank.

29.     Michael Richards, Jr. is an individual and a resident of Glen Allen, Virginia. The purchase of his property is described in Exhibit 17.  Mr. Richards did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America or Carolina First.

30.     Michelle Neihaus is an individual and a resident of Ashburn, Virginia. The purchase of her property is described in Exhibit 18.  Ms. Neihaus did not receive a Property Report from any Defendant in connection with the purchase of her lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant Coastal and to the Defendant Lender BB&T.

31.     Aurena Raines is an individual and a resident of Fredericksburg, Virginia. The purchase of her property is described in Exhibit 19.  Ms. Raines did not receive a Property Report from any Defendant in connection with the purchase of her lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Cooperative Bank.

32.     Doris Hottel is an individual and a resident of Fredericksburg, Virginia. The purchase of her property is described in Exhibit 20.  Ms. Hottel did not receive a Property Report from any Defendant in connection with the purchase of her lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Woodlands Bank.

33.     Michael and Sherry Jett are a married couple and are residents of Prospect, Pennsylvania. The purchase of their property is described in Exhibit 21.  The Jetts did not receive a Property Report from any Defendant in connection with the purchase of their lot.  Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Cooperative Bank.

34.     Richard and Betty Green are a married couple and are residents of Arlington, Virginia. The purchase of their property is described in Exhibit 22.  The Greens did not receive a Property Report from any Defendant in connection with the purchase of their lot.  Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Cooperative Bank.

35.     Robert and Annette McKeag are a married couple and are residents of Fairfax, Virginia. The purchase of their property is described in Exhibit 23.  The McKeags did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Carolina First.

36.     Stewart Ellis is an individual and a resident of Centreville, Virginia. The purchase of his property is described in Exhibit 24.  Mr. Ellis did not receive a Property Report from any Defendant in connection with the purchase of his lots.  Therefore, this Plaintiff rescinded the

transactions on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lenders Carolina First and Cooperative Bank.

37.     Elizabeth Pereira is an individual and a resident of Centreville, Virginia. The purchase of her property is described in Exhibit 25.  Ms. Pereira did not receive a Property Report from any Defendant in connection with the purchase of her lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Carolina First.

38.     Phyllis and Edmond Crager are a married couple and are residents of Woodbridge, Virginia. The purchase of their property is described in Exhibit 26.  The Cragers did not receive a Property Report from any Defendant in connection with the purchase of their lot.  Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant Hernandez and to the Defendant Lender BB&T.

39.     Theodora Basse is an individual and a resident of Coloma, Wisconsin. The purchase of her property is described in Exhibit 27.  Ms. Basse did not receive a Property Report from any Defendant in connection with the purchase of her lot.  Therefore, this Plaintiff rescinded the transaction on May 21, 2009 by letter to Developer Defendant Hernandez and to the Defendant Lender BB&T.

40.     Roger and Cathy Jones are a married couple and are residents of Manassas, Virginia. The purchase of their property is described in Exhibit 28.  The Joneses did not receive a Property Report from any Defendant in connection with the purchase of their lot.  Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Woodlands Bank.

41.     Kimberly Graham is an individual and a resident of Arlington, Virginia. The purchase of her property is described in Exhibit 29.  Ms. Graham did not receive a Property Report from any Defendant in connection with the purchase of her lot.  Therefore, this Plaintiff rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Carolina First.

42.     Felicia Barnes is an individual and a resident of Woodbridge, Virginia. The purchase of her property is described in Exhibit 30.  Ms. Barnes did not receive a Property Report from any Defendant in connection with the purchase of her lot.  Therefore, this Plaintiff rescinded the transaction on May 21, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Carolina First.

43.     Michelle Fox is an individual and a resident of Oakton, Virginia. The purchase of her property is described in Exhibit 31.  Ms. Fox did not receive a Property Report from any Defendant in connection with the purchase of her lot.  Therefore, this Plaintiff rescinded the transaction on May 21, 2009 by letter to Developer Defendant Premier and to the Defendant Lender RBC Centura Bank.

44.     Christian Downward is an individual and a resident of Sterling, Virginia. The purchase of his property is described in Exhibit 32.  Mr. Downward did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this Plaintiff rescinded the transaction on May 21, 2009 by letter to Developer Defendant Premier and to the Defendant Lender Bank of America.

45.     Sahr Alpha-K is an individual and a resident of Woodbridge, Virginia. The purchase of her property is described in Exhibit 33.  Mr. Alpha-K did not receive a Property Report from any Defendant in connection with the purchase of her lots.  Therefore, this Plaintiff

rescinded the transaction on May 21, 2009 by letter to Developer Defendant TRM and to the Defendant Lenders Bank of America and Carolina First.

46.     Christopher LaRose is an individual and a resident of Bristow, Virginia. The purchase of his property is described in Exhibit 34.  Mr. LaRose did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this Plaintiff rescinded the transaction on May 21, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

47.     Marie and Mark Judge are a married couple and are residents of Ocala, Florida. The purchase of their property is described in Exhibit 35.  The Judges did not receive a Property Report from any Defendant in connection with the purchase of their lot.  Therefore, these Plaintiffs rescinded the transaction on May 21, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

48.     Yim Sigua is an individual and a resident of Leesburg, Virginia. The purchase of her property is described in Exhibit 36.  Ms. Sigua did not receive a Property Report from any Defendant in connection with the purchase of her lot.  Therefore, this Plaintiff rescinded the transaction on May 21, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

49.     Janice Gray is an individual and a resident of Laurel, Maryland. The purchase of her property is described in Exhibit 37.  Ms. Gray did not receive a Property Report from any Defendant in connection with the purchase of her lot.  Therefore, this Plaintiff rescinded the transaction on May 26, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

50.     Nickolas Katsakis is an individual and a resident of U.S. EMBASSY, MOSCOW, RUSSIA or Arlington, Virginia. The purchase of his property is described in Exhibit 38.  Mr. Katsakis did not receive a Property Report from any Defendant in connection with the purchase of his lot.  Therefore, this Plaintiff rescinded the transaction on May 21, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

51.     Emma and Harold Jones are a married couple and are residents of Bowie, Maryland. The purchase of their property is described in Exhibit 39.  The Joneses did not receive a Property Report from any Defendant in connection with the purchase of their lot.  Therefore, these Plaintiffs rescinded the transaction on May 21, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Bank of America.

52.     Joseph and Catherine Seebald are a married couple and are residents of Orchard Park, New York. The purchase of their property is described in Exhibit 40. The Seebalds did not receive a Property Report from any Defendant in connection with the purchase of his lot. Therefore, these Plaintiffs rescinded the transaction on April 14, 2009 by letter to Developer Defendant TRM and to Defendant Lender Bank of America.

53.     Joseph and Marilyn Bawol are a married couple and are residents of Bealeton, Virginia. The purchase of their property is described in Exhibit 41. The Bawols did not receive a Property Report from any Defendant in connection with the purchase of their lots. Therefore, these Plaintiffs rescinded the transaction on July 21, 2009 by letter to Developer Defendant Premier and Defendant Lender Essex Bank (f/k/a Suburban Federal Savings Bank) and Bank of America.

54.     Mark and Diane Tudor are a married couple and are residents of Charlotte, North Carolina. The purchase of their property is described in Exhibit 42. The Tudors did not receive a

Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on July 21, 2009 by letter to Developer Infinity Partners and Defendant Lender Carolina First.

55.     Matthew Schoolfield is an individual and a resident of Huntersville, North Carolina. The purchase of his property is described in Exhibit 43. Mr. Schoolfield did not receive a Property Report from any Defendant in connection with the purchase of his lot. Therefore, this Plaintiff rescinded the transaction on July 21, 2009 by letter to Developer Infinity Partners (bankrupt and not a party to this action) and Defendant Lender BB&T.

56.     David S. Lewis, Jr.,  is an individual and a resident of Hickory, North Carolina. The purchase of his property is described in Exhibit 44. Mr. Lewis did not receive a Property Report from any Defendant in connection with the purchase of his lot. Therefore, this Plaintiff rescinded the transaction on July 21, 2009 by letter to Developer Defendant Maryville and Defendant Lender Bank of America.

57.     Jeffrey P. Gniadek is an individual and a resident of Hickory, North Carolina. The purchase of his property is also described in Exhibit 45. Mr. Gniadek did not receive a Property Report from any Defendant in connection with the purchase of his lot. Therefore, this Plaintiff rescinded the transaction on July 21, 2009 by letter to Developer Defendant Maryville and Defendant Lender Bank of America.

58.     Cynthia Wilson is an individual and a resident of Springfield, Virginia. The purchase of her property is described in Exhibit 46. Ms. Wilson did not receive a Property Report from any Defendant in connection with the purchase of her lot. Therefore, this Plaintiff rescinded the transaction on July 21, 2009 by letter to Developer Defendant Premier and Defendant Lender Bank of America.

59.     Mark Martino is an individual and a resident of Centreville, Virginia. The purchase of his property is described in Exhibit 47. Mr. Martino did not receive a Property Report from any Defendant in connection with the purchase of his lot. Therefore, this Plaintiff rescinded the transaction on July 21, 2009 by letter to Developer Defendant TRM and Defendant Lender Bank of America.

60.     Julie A. Bartlett is an individual and resident of Long Beach, California. The purchase of their property is described in Exhibit 48. Ms. Bartlett did not receive a Property Report from any Defendant in connection with the purchase of her lot. Therefore, this Plaintiff rescinded the transaction on August 29, 2009,  by letter to Developer Defendant TRM and to the Defendant Lender Cooperative.

61.     Daryl and Lorna Basse's purchases are described in Exhibit 49.  The Basses did not receive a Property Report from any Defendant in connection with the purchase of their lots. Therefore, these Plaintiffs rescinded the transaction on May 21, 2009 by letter to Developer Defendant Hernandez and to the Defendant Lenders Bank of America and Macquarie Mortgages USA, Inc.

62.     Paul H. and Barbara Blakeman are a married couple and residents of Virginia. The purchase of their property is described in Exhibit 50. The Blakemans did not receive a Property Report from any Defendant in connection with the purchase of his lot. Therefore, this Plaintiff rescinded the transaction on August 29, 2009 by letter to Developer DefendantTRM and Defendant Lender Bank of America.

63.     Erin Blystone is an individual and a resident of Virginia.  The purchase of her property is described in Exhibit 51. Ms. Blystone did not receive a Property Report from any Defendant in connection with the purchase of her lot.

64. Robbie and Jerome Cullen are a married couple and residents of Maryland. The purchase of their property is described in Exhibit 52. The Cullens did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on August 29, 2009 by letter to Developer Infinity and Defendant Lender SunTrust.

65. Michael and Anita Ford are a married couple and residents of Maryland. The purchase of his property is described in Exhibit 53. The Fords did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on  August 29, 2009 by letter to Developer Defendant Premier and Defendant Lender Bank of America.

66. George and Cindy Grunbaum are married individuals residing in San Jose, California. The purchase of their property is described in Exhibit 54. The Grunbaums did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on August 29, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Cooperative.

67. Anh T. and Toan Q. Ngo are a married couple and residents of Virginia. The purchase of his property is described in Exhibit 55. The Ngos did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on August 29, 2009  by letter to Developer Defendant Premier and Defendant Lender Bank of America.

68. Leo N. and Karen Dionisio are a married couple and residents of Maryland. The purchase of his property is described in Exhibit 56. The Dionisios did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these

Plaintiffs rescinded the transaction on August 29, 2009 by letter to Developer Defendant Premier and Defendant Lender Bank of America.

69.     William and Teresa Elliott are married individuals residing in Folsom, California. The purchase of their property is described in Exhibit 57. The Elliotts did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on August 29, 2009 by letter to Developer Defendant TRM and to the Defendant Lender Cooperative.

70.     Steven and Holly Shannon are a married couple and residents of North Carolina. The purchase of their property is described in Exhibit 59. (Exhibit 58 has been omitted)  The Shannons did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on August 29, 2009 by letter to Developer Defendant TRM and Defendant Lender Bank of America.

71.     Patrick Tonkinson is an individual residing in Roanoke, Virginia.  The purchase of his property is described in Exhibit 60. Mr. Tonkinson did not receive a Property Report from any Defendant in connection with the purchase of his lot. Therefore, this Plaintiff rescinded the transaction on August 29, 2009 by letter to Developer Defendant TRM and Defendant Lender Bank of America.

72.     James Oliver is an individual and a resident of Virginia. The purchase of his property is described in Exhibit 61. Mr. Oliver did not receive a Property Report from any Defendant in connection with the purchase of his lot. Therefore, this Plaintiff rescinded the transaction by letter to Developer Defendant TRM and Defendant Lender Bank of America.

73.     Mark Smith is an individual and a resident of Virginia. The purchase of his property is described in Exhibit 62. Mr. Smith did not receive a Property Report from any

Defendant in connection with the purchase of his lot. Therefore, this Plaintiff rescinded the transaction on August 29, 2009 by letter to Developer Defendant TRM and Defendant Lender Bank of America.

74.     Ester Lopes is an individual and a resident of Virginia. The purchase of her property is described in Exhibit 63. Ms. Lopes did not receive a Property Report from any Defendant in connection with the purchase of her lot. Therefore, this Plaintiff rescinded the transaction on August 29, 2009 by letter to Developer Defendant Premier and Defendant Lender Bank of America.

75.     Steven Gilford is an individual and a resident of Virginia. The purchase of his property is described in Exhibit 64. Mr. Gilford did not receive a Property Report from any Defendant in connection with the purchase of his lot. Therefore, this Plaintiff rescinded the transaction on August 29, 2009 by letter to Developer Defendant Providence and Defendant Lender Wachovia.

76.     Dora and John Emig, Jr. are a married couple and are residents of Fort Belvoir, Virginia. The purchase of their property is described in Exhibit 65. The Emigs did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on June 4, 2009 by letter to Developer Defendant Premier and Defendant Lender Bank of America.

77.     Diane Chiaravalloti and Phillip Stephenson are a married couple and residents of North Carolina. The purchase of their property is described in Exhibit 66. These Plaintiffs did not receive a Property Report from any Defendant in connection with the purchase of their lot. Therefore, these Plaintiffs rescinded the transaction on August 29, 2009 by letter to Developer Infinity and Defendant Lender Wachovia.

## DEFENDANT CORPORATE DEVELOPERS[1]

78.     Total Realty Management, L.L.C. ("TRM") is a Virginia limited liability company with its principal place of business at 12656 Darby Brook Court, Woodbridge, VA 22912.  TRM has filed bankruptcy in the Eastern District of Virginia 09−11938−RGM and is not a party to this litigation.  TRM is, upon information and belief, a non-party co-conspirator to the other Defendants for most of the acts complained of herein. TRM is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5)

79.     Defendant, R.A. North Development, Inc. ("RAN") is a North Carolina corporation with its principal place of business in North Carolina.  RAN was the original title holder, prior to the acts complained of herein, to the real property located in Carteret County, North Carolina which became known as Cannonsgate.

80.     Defendant R.A. North Development I, Inc. ("RAN I") is a North Carolina corporation with its principal place of business in North Carolina.  RAN I was the original title holder, prior to the acts complained of herein, to the real property located in Onslow County, North Carolina which became known as Summerhouse.

81.     Defendant Maryville Partners, Inc. ("Maryville") purports to be a South Carolina corporation doing business in North and South Carolina. Maryville is the original title holder to the real property located in Georgetown County, South Carolina which became known as Craven's Grant. Summerhouse, Cannonsgate and Craven's Grant will be referred to as "the Subdivisions" as applicable throughout the balance of this Complaint. Maryville is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5).

---

[1] For purposes of this Complaint both the Corporate Developers and the Individual Developers, *infra*, are referred to as the Developer Defendants unless otherwise identified in their individual capacity.

82.     Summerhouse, Cannonsgate and Craven's Grant are "Subdivisions" as defined by 15 U.S.C. §1701(3).

83.     Defendant Coastal Realty Group, LLC ("Coastal") is a Virginia limited liability company doing business in North Carolina.  Coastal is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5).

84.     Defendant Premier Realty Management LLC ("Premier") is a Virginia limited liability company doing business in North Carolina. Premier is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5).

85.     Providence Global Financial & Technology Group, LLC ("Providence") is a Virginia limited liability company.

86.     Hereafter, TRM, Metro, Premier, Coastal and Providence are sometimes collectively referred to as the "Developer Defendants."

### INDIVIDUAL DEFENDANT DEVELOPERS[2]

87.     Defendant Mark Dain ("Dain") is an individual and a resident of Virginia. Dain is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5)

88.     Mark Jalajel ("Jalajel") is an individual and a resident of Virginia.  Jalajel has filed for bankruptcy in the Eastern District of Virginia (Case # 09-11453) and is not a party to this litigation. Jalajel is, upon information and belief, a non-party co-conspirator to the other Defendants. Jalajel is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5)

89.     Defendant Michael McCracken ("McCracken") is an individual and a resident of Virginia. McCracken is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5)

90.     Cari V. Deuterman ("Deuterman") is an individual and a resident of Virginia. Deuterman has filed for bankruptcy in the Eastern District of Virginia (Case #09-13304) and is

---

[2] *See* note 1

not a party to this litigation. Deuterman is, upon information and belief, a non-party co-conspirator to the other Defendants. Deuterman is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5)

91.     At all times relevant hereto, Defendant Randolph (previously described as Randall or Randy Allen) Allen was the owner and operator of RAN and RAN I and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Randy Allen is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5).

92.     Defendant William Allen (hereinafter "Gary Allen") was the owner and operator of Southeastern Waterfront Marketing and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Gary Allen is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5).

93.     Defendant, Aaron Hernandez ("Hernandez") is an individual who purports to do business as Metropolitan Investment Group and/or First Metro Mortgage ("Metro"), however, upon information and belief, neither Metropolitan Investment Group and/or First Metro Mortgage is a properly organized corporation, limited liability company or partnership. Hernandez is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5).

94.     Defendant, Peter Neathery ("Neathery") is an individual who purports to do business as Metropolitan Investment Group and/or First Metro Mortgage ("Metro"), however, upon information and belief, neither Metropolitan Investment Group and/or First Metro Mortgage is a properly organized corporation, limited liability company or partnership. Neathery is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5).

95.     At all times relevant hereto, Defendant John Boden ("Boden") was the owner and operator of Coastal and was directly involved in the operation of the scheme to defraud the

Plaintiffs herein. Boden is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5).

96.     At all times relevant hereto, Defendant Scott Brogan ("Brogan") was the managing member of Premier and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Brogan is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5).

97.     At all times relevant hereto, Richard Mace Watts, Jr. ("Mace") was a managing member or a member of Southeastern Waterfront Marketing and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Mace is a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5). Mace was also directly involved in one or more "flip" transactions and actively, deliberately and purposefully engaged in fraudulent conduct, in conjunction with other Defendants.  In addition, it was Mace Watts who most often contracted the Defendant Lenders instructing them as to the price to place on the appraisals well in advance of any alleged underwriting or even before a purchaser was identified.

98.     Infinity Partners  LLC is a North Carolina corporation, now in bankruptcy, and acted as a "developer" as that term is defined under the ILSA 15 U.S.C. §1701(5).  Infinity is identified in this action as a non-party co-conspirator.

## PROMOTER DEFENDANTS

99.     Southeastern Waterfront Marketing ("Southeastern") is a North Carolina corporation with its principal place of business in North Carolina. Southeastern is run at the behest of Randy Allen and does the bidding of Randy Allen, through Southeastern's spokesperson, Mace Watts, it setting the highly fraudulent appraisal values for the property.

100.    In addition to Southeastern, other persons or entities to be identified during discovery acted in concert with Southeastern and are properly characterized as a promoter for the scheme.

### **LENDER DEFENDANTS**[3]

101.    Bank of America is a nationally chartered bank with its principal place of business in North Carolina and has banking locations is New York, Virginia, Pennsylvania, Georgia, and Maryland.

102.    Carolina First Bank is a nationally chartered bank with its principal place of business in South Carolina and has banking locations throughout North Carolina and South Carolina.

103.    Suburban Federal Savings Bank was a nationally chartered bank with its principal place of business in Maryland. Sometime in 2008 or 2009, Suburban Federal Savings Bank was acquired by Bank of Essex.

104.    RBC Bank is a nationally chartered bank with its principal place of business in North Carolina.

105.    Branch Banking and Trust Company of South Carolina ("BB&T") is a nationally chartered bank with its principal place of business in South Carolina and has banking locations throughout North Carolina.

106.    Woodlands Bank is a nationally chartered bank with its principal place of business in South Carolina and has banking locations throughout North Carolina.

---

[3] For purposes of this Complaint, all of the Lender Defendants are referred to as the Lender Defendants, collectively, unless otherwise identified in their individual capacity.

107.    Cooperative Bank for Savings, Inc. is a nationally chartered bank with its principal place of business in South Carolina and has banking locations throughout North Carolina. Cooperative was taken over by the FDIC in 2009 and is now First Bank.

108.    SunTrust Banks, Inc. is a nationally chartered bank with its principal place of business in Georgia and regularly does business in North and South Carolina.

109.    Wachovia Corporation n/k/a Wells Fargo Bank is a nationally chartered bank with offices throughout the United States and regularly doing business in North and South Carolina.

## HOMEOWNERS ASSOCIATIONS

110.    Cannonsgate at Bogue Sound Homeowners Association is a North Carolina corporation operating in Carteret County, North Carolina.

111.    Craven's Grant Homeowners Association, Inc. is a South Carolina corporation operating in Georgetown County, South Carolina.

112.    Summerhouse Homeowners Association, Inc. is a North Carolina corporation operating in Onslow County, North Carolina.

113.    For purposes of this action, all three homeowners association will be referred to, collectively, as the HOA.

## APPRAISER DEFENDANTS[4]

114.    Berthadale R. Best is a duly licensed real estate appraiser doing business in North Carolina.

115.    James S. Wagoner was a duly licensed real estate appraiser at all times relevant hereto, doing business in North Carolina.

---

[4] For purposes of this Complaint, all of the Appraiser Defendants are referred to as the Appraiser Defendants, collectively, unless otherwise identified in their individual capacity.

116.    Emily L. Adams is a duly licensed real estate appraiser doing business in North Carolina.

117.    Jennifer C. Parker is a duly licensed real estate appraiser doing business in North Carolina.

118.    John Todd is a duly licensed real estate appraiser doing business in North Carolina.

119.    Alan Sullivan is a duly licensed real estate appraiser doing business in North and South Carolina.

## FRAUDULENT SCHEME

### R. A. North Acquires Summerhouse and Cannonsgate; Maryville Acquires Cravens Grant

120.    Defendant RAN I acquired approximately 214.79 acres in Onslow County, North Carolina on June 20, 2006 for not less than $12,500,000.  This undeveloped parcel was subdivided and came to be known as the "Summerhouse on Everett Bay" subdivision.  RAN I acquired Summerhouse through mortgage financing and was subject to a blanket lien to be released upon the sale of a certain volume of lots. Soon thereafter, RAN I began selling the improved lots in the range of $140,000 to $325,000 (for descriptive purposes only, these sales are described as the "fair market sales price").

121.    Defendant RAN[5] acquired approximately 300 acres in Carteret County, North Carolina, which came to be known as the "Cannonsgate on Bogue Sound" subdivision sometime prior to July 5, 2005 for at least $12,000,000.  RAN acquired Cannonsgate through mortgage financing and was subject to a blanket lien to be released upon the sale of a certain volume lots.  Soon thereafter, RAN began reselling the improved lots in the range of $199,000 to as much as

---

[5] For purposes of the balance of this Second Amended Complaint, RAN and RAN I will be identified as "RAN".

$700,000 for waterfront lots. (for descriptive purposes only, these sales are described as the "fair market sales price").

122.     Defendant Maryville acquired property in Georgetown County, South Carolina, which came to be known as the "Craven's Grant" subdivision sometime prior to April 7, 2006 for approximately Eight Million Dollars.  Maryville acquired Craven's Grant through mortgage financing through, among others, Defendant Carolina First and was subject to a blanket lien to be released upon the sale of a certain volume lots. Soon thereafter, Maryville began reselling the improved lots in the range of $199,000 (for descriptive purposes only, these sales are described as the "fair market sales price"). At some point during 2006-2007 Maryville conveyed all or part of its property to an entity known as Cravensgrant II, LLC which limited liability company is wholly owned by Maryville.  For purposes of this Complaint, Maryville and Cravensgrant II, LLC shall be designated as Maryville.

123.     Following the acquisition of the Subdivisions, RAN sold some lots at the fair market value, primarily to purchasers already residing in North Carolina.

124.     Similarly, following its acquisition of the property in Georgetown County, South Carolina, Maryville sold some lots at the fair market value, primarily to purchasers already residing in North and South Carolina.

125.     Beginning sometime after February, RAN and Maryville were approached, first by TRM and later PRM, Coastal, Metro and Providence with a scheme to sell the property in Summerhouse, Cannonsgate and Cravens Grant.   The scheme required that the developers fractionalize the size of the lots and then allow TRM, PRM, Coastal, Providence and Metro to artificially inflate the existing prices by creating three or more phony purchases to straw men

acting at the behest of TRM, PRM, Coastal, Providence or Metro at prices 2.5 to 3 times the amount of the fair market value.

## The Promotion and Selling of Summerhouse, Cannonsgate and Craven's Grant

126.    As a part of the overall scheme to fraudulently misrepresent the fair market value of the lots for the purpose of selling the lots at grossly inflated prices, the Developer Defendants and Promoter Defendants began engaging in a widespread, highly publicized marketing plan to induce persons living outside of North or South Carolina to invest in the Subdivisions.

127.    The process of finding potential purchasers was elaborate and expensive. TRM in connection with Defendant Southeastern held large scale meetings where the benefits of lot ownership were promoted. The Promoter Defendants and Southeastern distributed highly stylized promotional material complete with carefully crafted, personal testimonials from "average people" who had profited from buying and selling lots within months of their initial purchase.    Throughout these many meetings and events, TRM, Metro, Premier, Coastal, Providence and Southeastern produced several different examples of profits made on the purchase and resale of investment properties, claiming to represent actual transactions experienced by former customers, attesting to the quick turnover and big profits.    These testimonials were pawned off as success stories but actually represented instances in which TRM "hand picked" customers from whom they repurchased lots at prices in excess of their already inflated prices so as to create a buzz in the community. These testimonials were designed to and had the effect of inducing the Plaintiffs to purchase the property.

128.    Each Plaintiff acquired their respective lots with a 3 or 5 year adjustable rate mortgage, interest only  and a balloon payment at the end of five years.

129.     TRM was chiefly and principally involved in the initial scheme to sell the subdivision lots for excessive prices, however Metro, Premier, Providence and Coastal soon entered into identical fraudulent schemes, utilizing the same phony appraisals and generally following the pattern established by TRM.

130.     Through a series of exotic and elaborate open houses, parties and events, the Plaintiffs were induced to believe that the property had unique investment value and that, based upon the "experience" of the other Developers' customers, these Plaintiffs were certain to obtain a substantial return on investment after only months of ownership.

131.     All Defendant Developers offered trips, private transportation and luxury accommodations in order to induce the potential buyers to come to the many open houses sponsored by all Defendants.  Once there, the centerpiece of the presentation offered by TRM was a Power Point presentation which, among other things, promised that new buyers would benefit from a 50% discount TRM received from RAN or Maryville which in turn allowed TRM to give the Plaintiffs "larger rebates." Exhibit 67.  TRM also addressed "The Risk" involved:

- The only risk-free endeavors are Savings accounts and CDs;

- Risk is hedged by eliminating costs for 2 years and putting money in the bank from the beginning; and

- Appraisal satisfaction guaranteed.

132.     It is uncontested that each of the Defendant Developers disseminated the same information about the investment in the form of a color brochure that offered a number of promises which were designed to deceive potential investors like Plaintiffs herein.

133.     All Defendant Developers, especially Southeastern and TRM, used "invitation only" mailings, in some cases charging the potential investors $99 to attend, in order to create a frenzy among purchasers that this investment was, indeed, exclusive and fleeting unless they

acted quickly. Otherwise, all Defendant Developers absorbed the costs associated with these substantial and expensive open houses, creating the impression in the minds of Plaintiffs that the project was well funded and that the successful return on their investment was certain.

134. As a further inducement to convince the Plaintiffs to buy lots, TRM, Metro, Premier, Providence and Coastal represented that each owned a large volume of lots and could therefore sell to the Plaintiffs at a substantial "wholesale" discount. In a few circumstances, the Defendants claimed to have an "option" to purchase lots at "wholesale" prices and again promised to pass the savings on to the Plaintiffs. None of these claims were true as at no time did TRM, Metro, Premier or Coastal actually own title to the properties they were marketing as "part of their inventory." Instead, each of these Defendants used the Plaintiff's mortgage financing to acquire title moments before "flipping" the property in a simultaneous closing to the Plaintiffs for prices 2-3 times their fair market value.

135. The Developer Defendants in conjunction with RAN and Southeastern utilized an elaborate sales pitch promising the Plaintiffs a substantial return on their investment in 6-18 months. In one or more cases, the Plaintiffs were advised that "most people in this deal are selling within 6 months to 2 years" for a substantial profit. It is uncontested that as of the date of that statement neither TRM, Metro, Premier, Providence or Coastal had been selling lots in either Subdivision for 6 months to 2 years.

### PLAINTIFFS RECEIVE THE OFFER TO INVEST

136. All Plaintiffs, regardless of whether the Seller was TRM, Metro, Premier or Coastal were offered the same deal. Indeed, even the purchase agreement forms were identical in virtually all cases whether the Seller was TRM, Metro, Premier, Providence or Coastal. TRM, Metro, Premier, Providence and Coastal, with the direct assistance and cooperation of the other

Defendants, offered to pay all closing and settlement costs, contribute a 10% "down payment" (which TRM, Metro, Premier, Providence and Coastal referred to as "immediate equity") as well as to pay the first two years of mortgage interest payments. The 10% down payment credit was typically shown on the settlement statement as "earnest money deposit" as if the buyer had deposited that amount with the seller at the time of contract. The two years of mortgage interest payments were not shown on the settlement statement at all, and were disbursed to the buyers after closing.

137. It is uncontested that each of the Defendant Developers acted, simultaneously, as mortgage brokers in connection with all Plaintiffs' application for financing.

138. It is uncontested that most of the Defendant Developers' employees were not properly licensed mortgage brokers, nor did most of these alleged "brokers" act for or on behalf of a specific Lender Defendant. Instead, each of the "mortgage consultants" acted for and on behalf of all other Defendants in order to effectuate the scheme.

139. Even before the Plaintiffs could bid on certain property, the price and, consequently, the ill gotten gain, had already been determined by all Defendants. Although it was not known to the Plaintiffs, all other Defendants knew that the properties alleged to be under "option" or in the inventory of the Defendant Developers had either been previously sold for 50% less than the parcel contiguous to it; or was "acquired" by the Defendant Developer at a price that was at least 50% less than the Defendant Developer charged Plaintiffs.

140. In addition to its overall marketing scheme, TRM, Metro, Premier, Coastal, Providence and Southeastern engaged in numerous other misrepresentations including telling potential purchasers that lots were selling out very soon; telling purchasers that they would be able to resell their lots easily for a profit; each Developer Defendant represented that it owned

the lots that it offered for sale to purchasers; and each held itself out as acting as the purchasers' real estate agent. None of these representations were true.

141.     Prior to the actual purchase of the property, each Plaintiff received a loan package from the ostensible mortgage representative representing one of the Defendant Developers. Contained within that mortgage application package was a disclaimer, identical in form regardless of which Lender Defendant was involved, indicating that the loan was contingent on the successful appraisal.

142.     The Plaintiffs knew, or were told, that the Defendant Lenders would act independently for purposes of determining the appraised value of the property and its corresponding suitability as collateral for their loans. As a practical matter, it was the Defendant Lenders who were charged with determining the fair market value of the lot to be purchased.

143.     Moreover, without the appraised value coming in - remarkably - exactly as required, the Plaintiffs were incapable of closing the transaction.  Virtually every Plaintiff had an economic profile that would not permit an additional, substantial loan payment and therefore the entire transaction was wholly dependent upon the property appraisal; a fact that each and every party to the transaction knew and understood.  Further, unless the property was determined to be sufficient collateral for the loan, no Plaintiff could have qualified to acquire the property.

144.     Each of the Defendant Lenders has publicly decried the allegation that it made under-collateralized loans in connection with these Subdivisions.  Each Defendant Lender has claimed that they, too, are a victim in this fraud perpetrated by all Defendants. However, most of the lender defendants were making loans contemporaneously to parties purchasing essentially equivalent lots directly from the developer at less than half the contract prices (and appraised values) being paid by the plaintiffs herein. For all of the reasons set forth herein, however, the

Defendant Lenders had actual knowledge that the transactions, most especially the appraisals, were entirely fraudulent.

## ALL DEFENDANTS KNEW THAT THE APPRAISAL PROCESS WAS RIGGED

145.    No single Plaintiff in this action would have possibly been able to maintain the debt schedule on the loan application AND the debt service associated with these transactions without a sale, as promised, within 6 to 18 months. The Lender Defendants ignored most underwriting standards and instead relied upon stated (not verified) income statements.    In reality, the single most important determination regarding who would or would not qualify for a "loan" was the appraisal.

146.    Upon information and belief, with one solitary exception, not a single Plaintiff who applied for financing with any of the Defendant Lenders was denied.    Each and every Plaintiff, regardless of their economic circumstances, was approved because the Defendant Lenders had designed the entire loan program around making sure the loan applicant would qualify and that the appraisal came in as predicted.

147.    It is uncontested that State and Federal underwriting regulations require that appraisals be accurate and independent. See 12 USC §§3331 *et seq.*  The Uniform Standards of Professional Appraisal Practice are incorporated into federal, South Carolina and North Carolina law. See 12 C.F.R. §34.44; 93E-1-12(a)(9).    The Defendant Lenders' own loan documents support this proposition because all Plaintiffs received loan applications which stated that appraisals were to be done in connection with the loan and were a critical component of the Defendant Lenders underwriting process.

148.    A common thread in all of these multiple transactions was that the Plaintiffs could not close on the purchase unless the appraisal process demonstrated to the Defendant Lenders

that the collateral was adequate to cover the loan. The Plaintiffs, who would never be able to cover the debt service on these loans from their income or investment assets, relied upon the Defendant Lenders' representations that, consistent with their own loan applications, a thorough underwriting processes was ongoing and that reputable, independent appraisers were being utilized as required by law, to make determinations as to the fair market value of the property.

149. While not an element in Counts 4 and 5, the reliance of the Plaintiffs on their various Defendant Lenders is significant. Charged with the knowledge and experience of a nationally chartered bank, and with the training, education and experience of decades of mortgage lending, the Defendant Lenders were the *sine qua non* that Plaintiffs needed before the sale of the property could be consummated. Once the Defendant Lender said the property appraised for a sum appropriate for the overall scheme, the Defendants were poised to close on property they knew had absolutely no chance of supporting the "value" assigned to it by the rigged appraisal.

150. What the Plaintiffs did not know, because all Defendants refused to disclose, was that the Plaintiffs were being defrauded through the use of appraisals that were rigged to return a particular value for the lot, in contravention of the Uniform Standards of Professional Appraisal Practice ("USPAP").

151. Upon information and belief, several times during this 15 month fraud, appraisers who were not "in line" with the fraudulent scheme would present an appraisal that was honest; which by definition meant that it would have appraised the property at fair market value and not the prices charged by the Defendant Developers for the same lot. Specifically, Plaintiffs know of at least two examples where an appraiser was discharged by one or more of the Defendant

Lenders because the appraisal that an appraiser offered reflected the authentic value of the lot and not the values predetermined by the Defendant Developers.

152.     Indeed, the appraisers who refused to play along with the fraudulent scheme were not long for Summerhouse, Cannonsgate or Craven's Grant because the sale price to the Plaintiffs had already been determined by the Defendant Developers.

153.     Upon information and belief, Mace Watts from Southeastern communicated with Lynne Cooke at Bank of America directing Bank of America to have certain lots appraise at a particular value. Lynne Cooke, in turn, told the appraisers what to value the property at.  So long as the Defendant Appraisers agreed to supply an appraisal that reflected the inflated price those appraisers were retained and used multiple times throughout the 15 months this scheme played out.   On the other hand, if an appraiser insisted on using real numbers and conforming to USPAP, that appraiser was discharged.

154.     As a result of the Lender Defendant's assurances about accurate appraisals and the Developer Defendant's marketing efforts, the Plaintiffs believed they were purchasing their lots under the following terms:

        a.     Lots sold at a discount because the Developer Defendants had acquired the lots at a deep discount.

        b.     No money down, but in addition, "instant equity" in the form of a 10% credit in lieu of a cash outlay for the down payment.

        c.     A rebate, from the closing proceeds, equal to the first two years of interest payments on a 5 year adjustable rate mortgage.

        d.     Countless personal stories of "average guys" making a return on investment in just 6-24 months.

        e.     Loans available on stated income with the appraised value of the property as the single determining factor as to the viability of the financing for the sale.

**LENDER DEFENDANTS' ROLE**

155.     The acts complained of herein all took place between early 2006 and 2007 when lax underwriting standards and methods for originating residential mortgages were becoming commonplace.  The Court is requested to take judicial notice of the widespread use of "no document" "stated income" and "paper saver" loan advertisements from all lenders led by the efforts of Bank of America's latest acquisition partner, Countrywide Mortgages, during the period before the bubble burst on the real property market in late 2007 and 2008.  The precursor to the sub-prime mortgage crisis that grips this nation today was the prevalence of the widespread failure of mortgage lenders to monitor the practices of its own loan originators and underwriters.

156.     All Lender Defendants engaged in unfair underwriting practices and followed a model that was supported and encouraged by the compensation awarded to originating loan officers employed by the Lender Defendants.

157.     It is uncontested that mortgage origination was a paramount goal of the Defendant Lenders during the relevant period.  Each of the Defendant Lenders compensated their loan officers by generous commissions depending upon the type of mortgage product sold.  Non-conventional three to five year adjustable rate mortgages were more valuable as a sales product and it is uncontested that every Plaintiff was sold such product whether they could qualify for different financing or not.

158.     Lender Defendants knew, or in the exercise of reasonable diligence should have known, that the market for the three developments at issue in this case had a finite limit to the value that a purchaser would ultimately place upon them. It is not credible that the Lender Defendants could believe that lots selling for "fair market value" could simultaneously be selling

for 2 1/2 times fair market value in an arms length transaction not otherwise affected by the fraudulent acts of the Co-Defendants.

159. Moreover, the Lender Defendants knew that no market could support a Ponzi like scheme of ever increasing prices, made through flip transactions, with increasing prices, forever. Unless the Lender Defendants can demonstrate that there was never a limit to a sale price, the practice of exponentially increasing the sale price of these slivers of undeveloped dirt was unreasonably risky for the Lender Defendants' customers.

160. The Lender Defendants publicly identified themselves as "preferred lenders" for the sales of the fraudulent transactions at the same time that these same Lender Defendants were closing mortgages to fair market value purchasers. The Lender Defendants knew that the scheme required their active participation. Certainly TRM, PRM, Coastal and Metro could set up a fraudulent scheme, but they could not fund it. The Lender Defendants chose to participate because it had the capital to invest in the project and were directed into the properties by loan officers and originator's financial self interest to do so.

161. The incentive for combining the corporate identity of the various Lender Defendants and the over-hyped sales efforts is evident from the number of sales made and the financing by the various Lender Defendants. For purposes of example only:

<u>**Cannonsgate Flip Transactions**</u>

    a.  Carolina First made at least 12 loans extending credit to risky borrowers in a flip transaction in Cannonsgate while simultaneously closing fair market transactions in the very same development.

    b.  SunTrust made at least 14 loans extending credit to risky borrowers in a flip transaction in Cannonsgate while simultaneously closing fair market transactions in the very same development.

    c.  Bank of America made at least 48 loans extending credit to risky borrowers in a flip transaction in Cannonsgate while simultaneously closing fair market transactions in the very same development.

       d.      BB&T made at least 4 loans extending credit to risky borrowers in a flip transaction in Cannonsgate while simultaneously closing fair market transactions in the very same development.

       e.      Cooperative Bank made at least 9 loans extending credit to risky borrowers in a flip transaction in Cannonsgate while simultaneously closing fair market transactions in the very same development.

       f.      RBC Central and First Flight FCU made one loan each to risky borrowers in a flip transaction in Cannonsgate while simultaneously closing fair market transactions in the very same development.

### Craven's Grant Flip Transactions

       a.      Carolina First made at least 15 loans extending credit to risky borrowers in a flip transaction in Craven's Grant while simultaneously closing fair market transactions in the very same development.

       b.      SunTrust made at least 3 loans extending credit to risky borrowers in a flip transaction in Craven's Grant while simultaneously closing fair market transactions in the very same development.

       c.      Bank of America made at least 10 loans extending credit to risky borrowers in a flip transaction in Craven's Grant while simultaneously closing fair market transactions in the very same development.

       d.      RBC Centura made at least 1 loan extending credit to risky borrowers in a flip transaction in Craven's Grant while simultaneously closing fair market transactions in the very same development.

       e.      First Flight FCU made at least 3 loans extending credit to risky borrowers in a flip transaction in Craven's Grant while simultaneously closing fair market transactions in the very same development.

       f.      First National Bank of Spartansburg made at least 3 loans extending credit to risky borrowers in a flip transaction in Craven's Grant while simultaneously closing fair market transactions in the very same development.

### Summerhouse Flip Transactions

       a.      Carolina First made at least 43 loans extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

       b.      SunTrust made at least 10 loans extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

c.    Bank of America made at least 105 loans extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

d.    BB&T made at least 24 loans extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

e.    Wachovia Bank made at least 5 loans extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

f.    Cooperative Bank made at least 36 loans extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

g.    RBC Centura made at least 1 loan extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

h.    Indymac made at least 2 loans extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

i.    Suburban Federal made at least 3 loans extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

j.    Woodlands Bank made at least 6 loans extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

k.    First National Spartanburg made at least 1 loan extending credit to risky borrowers in a flip transaction in Summerhouse while simultaneously closing fair market transactions in the very same development.

162.    Here the practices of the Lender Defendants were fundamentally unfair and violated the North Carolina Deceptive Trade Practices Act, N.C. GEN. STAT. §75-1 *et seq.*, and the South Carolina Deceptive Trade Practices Act, S.C. Code Ann. §39.5.140.  All of the Defendant Lenders participated in fair market value mortgages simultaneously with fraud mortgages.  All Defendant Lenders knew or had reason to know that the conspiracy amounted to a Ponzi scheme necessarily requiring an ever spiraling value for real property. All Defendant

Lenders knew that the goal of each of the borrowers was to flip the property because each of the borrowers was promised that such a flip was not only possible but inevitable. The Defendant Lenders' actual knowledge of the underlying scheme can not be genuinely denied because, among other reasons, each Defendant Lender had advance notice of the loan program designed by the Developers. Moreover, the Lender Defendants had representatives on site for many of the sales and informational meetings.

163.    Therefore, the perfect storm had come to fruition. Aggressive corporate policies designed to create revenues from the selling, servicing and securitizing of risky loans, coupled with an equally aggressive sales pitch (given credibility by the Lender Defendants' presence) and rigged appraisals joined together to create a massive fraudulent mortgage scheme that ultimately resulted in pervasive foreclosures and the diminution of property values in and around the developments.

164.    After a period of time, BOA, BB&T, Wachovia and Carolina First stopped lending against the fraudulent scheme and new banks were necessary for the fraud to continue. Remarkably, Defendant Developers had little trouble obtaining the cooperation of other lenders willing to engage in a lending scheme hopelessly in conflict with basic underwriting criteria. Thereafter, Woodlands, Bank of Essex, MacQuarie and Cooperative all began participating in the fraudulent scheme by continuing all of the sham underwriting techniques as the prior Defendant Lenders.

165.    Each of the Plaintiffs obtained their mortgages through one of the Defendant Lenders and each Plaintiff had virtually the identical experience with the loan process. TRM, Metro, Premier, Realty, Providence and Coastal each had agents, acting as unlicensed mortgage brokers, soliciting, collecting and transferring the Plaintiffs' income and credit history to the

Defendant Lenders. TRM, Metro, Premier, Providence and Coastal in concert with the Defendant Lenders selected only those Defendant Appraisers who would provide an appraisal for the property at the value necessary for the Defendants to obtain the fraudulent gain on the sale.

166.    Each of the Plaintiffs closed using a HUD-1 that purported to show a 10% down payment against the purchase price even though that down payment was never in fact made. Each of the Plaintiffs loan-to-value ratio was deliberately false; a fact known to the Defendant Lenders.

167.    The Defendant Lenders participated in these inflated sales, knowing that the purchaser was grossly overpaying for the property, as a part of a plan to grab the market share of loans made to or for the Subdivisions. The Defendant Lenders relaxed or ignored federal and state underwriting guidelines for the purpose of originating loans and consequently generating profits.  The Defendant Lenders authorized its loan officers, agents, servants and employees, to participate in open houses, sales meetings and promotions relating to the Subdivisions.

168.    Additionally, the Defendant Lenders were on site for many of the sales pitches made to these Plaintiffs and therefore knew that many, if not most of the investment purchasers, including the Plaintiffs herein, were relying upon the fraudulent misrepresentations made by TRM, Metro, Premier and Coastal about return of investment resulting from resale of the property in just weeks or months after the sale to Plaintiffs.

169.    The Defendant Lenders never spoke up or warned any purchaser, particularly Plaintiffs, that they were paying 2-3 times the price of identical lots in the identical Subdivision compared to sales that had occurred within days or weeks of each other.  Instead, the Defendant Lenders continued to write loans on information it did nothing to verify for properties that were overvalued by the fraudulently inflated appraisals to start.

170.     At all times relevant hereto, the Defendant Lenders knew that TRM, Metro, Premier and Coastal had no lots in their inventory and that TRM, Metro, Premier, Providence and Coastal would be required to conduct a concurrent settlement of both its acquisition purchase and its out-sale at the same settlement company, usually with deeds being recorded on the same day and within minutes of each other for each transaction.

171.     At all times relevant hereto, the Defendant Lenders knew that TRM, Metro, Premier, Providence and Coastal would use part of the sales proceeds from each lot to pay for its acquisition of that lot, along with closing costs.  Therefore, the Defendant Lenders not only knew that TRM was "flipping" the property, the Defendant Lenders knew the price TRM, Metro, Premier and Coastal paid and the mark-up of that price to the Plaintiffs.  Moreover, the Lender Defendants had actual knowledge of the flip transaction because an essential part of underwriting is a review of the title history on the property which demonstrated that the sellers in these transactions were selling property that they did not yet own. At all times relevant hereto, the Defendants, including TRM, Metro, Premier, Providence and Coastal, the Defendant Appraisers and the Defendant Lenders were acting for a common purpose and in concert with each other, directly and indirectly, regarding the promotion and sale of the lots in the Subdivisions to Plaintiffs.

**DEFENDANT LENDERS OWED A DUTY TO USE DUE DILIGENCE**

172.     The Defendant Lenders each owed a duty to the Plaintiffs to work only with licensed mortgage brokers, to communicate directly with Plaintiffs as the borrowers, to create true and accurate closing documents including the HUD-1 and obtaining its own appraisal for the property rather than relying upon appraisals tendered to them by others.

173.    At all times relevant hereto, the Defendant Lenders, their agents, servants and employees were acting within the scope of their employment for the purpose of promoting the origination of mortgage financing for the sale of lots in the Subdivisions.

174.    The Defendant Lenders each distributed loan application packages, either directly or through the unlicensed brokers each Defendant Lender employed, in which the criteria for the approval of a loan was described.  Each of the Defendant Lenders indicated that an appraisal was required to be performed.  Each of the loan packages dictated to the Plaintiffs which appraiser would be utilized by the Defendant Lender.  While the loan packages ostensibly allowed the Plaintiffs to select their own appraiser, the Defendant Lenders knew that each Plaintiff resided out of state and therefore the likelihood that the Plaintiff would have the local knowledge to select their own appraiser was remote.

175.    Defendant Lenders owed a duty to the Plaintiffs to utilize the proper underwriting criteria, to refrain from utilizing patently false or incorrect data from the mortgage broker and/or to verify directly with the Plaintiffs whether the information provided relative to the appraisal was accurate.

176.    The Defendant Lenders also owed the duty to Plaintiffs, the vast majority of whom were not sophisticated real estate purchasers, to follow standard underwriting guidelines. The Lender's duty included, but was not limited to:

        a.    determining whether the purchaser, not the seller, was making the down payment;

        b.    determining whether the purchaser, not the seller, was making the interest payments on the mortgage;

        c.    determine why the appraisal process utilized for these Plaintiffs used only comparables within the Subdivision, contrary to the Uniform Standards of Professional Appraisal Practice;

d.      conducting underwriting on all transactions within the Subdivisions instead of ignoring the RAN sales for fair market value;

e.      determining why it uniformly employed a loan program for stated income and a 5-year ARM instead of other conventional financing;

f.      determining whether or not the mortgage brokers were properly licensed; and

g.      confirming a 10% deposit was actually made confirm the source of funds for transaction.

h.      verifying that the seller held clear title and was therefore legally able to sell the property to the purchaser

## LIABILITY OF RAN

177.    Upon information and belief, the blanket mortgage on the purchase of Summerhouse and Cannonsgate required RAN to sell a certain percentage of the lots in the Subdivisions prior to obtaining partial releases from the underlying mortgage.  RAN was incentivized by its financing arrangement to sell lots and sell them fast. The fraudulent scheme operated to RAN's advantage. RAN acted in concert with the other Defendants to effectuate the scheme.

178.    For purposes of this action, RAN is a developer as that term is defined under ILSA because RAN knew that neither TRM, Metro, Premier or Coastal were ever the ultimate purchaser of the properties they sold, but instead fraudulently only "owned" title to the property for minutes before the property was flipped to the ultimate purchaser.  Pursuant to its duties as the developer, RAN was required to distribute Property Reports to Plaintiffs herein.  It is uncontested that RAN failed to distribute Property Reports to Plaintiffs herein.

179.    Moreover, RAN was TRM, Metro, Premier and/or Coastal's agent, as that term is defined under ILSA, because it actively participated in the marketing and sales of the Subdivision lots to Plaintiffs.

## LIABILITY OF MARYVILLE

180.    Upon information and belief, the blanket mortgage on the purchase of Craven's Grant required Maryville to sell a certain percentage of the lots in the Subdivisions prior to obtaining partial releases from the underlying mortgage.  Maryville was incentivized by its financing arrangement to sell lots and sell them fast. The fraudulent scheme operated to Maryville's advantage. Maryville acted in concert with the other Defendants to effectuate the scheme.

181.    For purposes of this action, Maryville is a developer as that term is defined under ILSA because Maryville knew that neither TRM, Metro, Premier or Coastal were never the ultimate purchaser of the properties they sold, but instead fraudulently only "owned" title to the property for minutes before the property was flipped to the ultimate purchaser.  Pursuant to its duties as the developer, Maryville was required to distribute Property Reports to Plaintiffs herein.  It is uncontested that Maryville failed to distribute Property Reports to Plaintiffs herein.

182.    Moreover, Maryville was TRM, Metro, Premier and/or Coastal's agent, as that term is defined under ILSA, because it actively participated in the marketing and sales of the Subdivision lots to Plaintiffs.

## LIABILITY OF SOUTHEASTERN

183.    Southeastern designed and planned the marketing strategy, materials, electronic media and related promotional material to Plaintiffs.  Notably, Southeastern through its agents and servants, promoted the possible resale of the lots affirming the illegitimate profit scheme designed by TRM, Metro, Premier and Coastal for the purpose of causing the Plaintiffs to rely upon those representations.

184. At all times relevant hereto, Southeastern had actual knowledge of TRM, Metro, Premier and Coastal's fraudulent scheme and actively assisted in the creation of and the distribution of the false and fraudulent marketing materials.

185. By operation of law, Southeastern owed a duty to distribute Property Reports to the Plaintiffs because Southeastern was acting as TRM, Metro, Premier and Coastal's agent. It is uncontested that Southeastern failed to distribute Property Reports to Plaintiffs.

186. Additionally, Mace Watts directed at least one Defendant Lender to have the appraisals come in at a certain price for purposes of the flip transaction. No surprise, the appraisals came in just as directed by Southeastern's Mr. Watts.

## INTERSTATE LAND SALES FULL DISCLOSURE ACT

187. The Interstate Land Sales Full Disclosure Act, 15 U.S.C §1701 *et seq.* ("ILSA") was passed in 1968 to prevent fraud in the sale of investment real estate. For purposes of this action, certain definitions are important:

> (4) "common promotional plan" means a plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease; where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name, such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan;

> (5) "developer" means any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision;

> (6) "agent" means any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision; but shall not include an attorney at law whose representation of another person consists solely of rendering legal services;

> (8) "interstate commerce" means trade or commerce among the several States or between any foreign country and any State; and

(10) "purchaser" means an actual or prospective purchaser or lessee of any lot in a subdivision."

188.    ILSA prohibits specific activities at §1703 in the sale or lease of property, and applies to <u>any developer or agent</u>, and covers their <u>direct or indirect activity</u>.   Among the protections offered purchasers of real property, ILSA states that a developer may not sell or lease lots in a subdivision, unless a (1) Statement of Record is in effect and unless each purchaser is given a printed (2) Property Report prior to signing any contract or agreement for sale or lease, all in accordance with the provisions of the Act and the regulations. §1703(a)(1).

189.    In addition to the statement of record and property report requirements, the Act has an anti-fraud section that covers a variety of prohibited acts. §1703(a)(2).  For example, section (b)(2) makes it unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails:

a.    to employ any device, scheme, or artifice to defraud;

b.    to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision;

c.    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser; or

d.    to represent that roads, sewers, water, gas, or electric service, or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed.

190.    The purchaser Plaintiffs described in Exhibit 68 all have the following facts and circumstances in common:

a.    They purchased through TRM;

b.    The purchase was financed by Bank of America;

      c.      They did not receive a property report prior to the sale; and

      d.      They have rescinded their sales agreement with TRM.

191.    The purchaser Plaintiffs described in Exhibit 69 all have the following facts and circumstances in common:

      a.      They purchased through Premier;

      b.      The purchase was financed by Bank of America;

      c.      They did not receive a property report prior to the sale; and

      d.      They have rescinded their sales agreement with Premier.

192.    The purchaser Plaintiffs described in Exhibit 70 all have the following facts and circumstances in common:

      a.      They purchased through Metro;

      b.      The purchase was financed by Bank of America;

      c.      They did not receive a property report prior to the sale; and

      d.      They have rescinded their sales agreement with Metro.

193.    The purchaser Plaintiffs described in Exhibit71 all have the following facts and circumstances in common:

      a.      They purchased through Coastal;

      b.      The purchase was financed by BB&T;

      c.      They did not receive a property report prior to the sale; and

      d.      They have rescinded their sales agreement with Coastal.

194.    The purchaser Plaintiffs described in Exhibit 72 all have the following facts and circumstances in common:

      a.      They purchased through Infinity Partners (a bankrupt non-party);

      b.      The purchase was financed by BB&T;

      c.      They did not receive a property report prior to the sale; and

       d.       They have rescinded their sales agreement with Infinity Partners.

195.    The purchaser Plaintiffs described in Exhibit 73 all have the following facts and circumstances in common:

       a.       They purchased through Metro;

       b.       The purchase was financed by BB&T;

       c.       They did not receive a property report prior to the sale; and

       d.       They have rescinded their sales agreement with Metro.

196.    The purchaser Plaintiffs described in Exhibit 74 all have the following facts and circumstances in common:

       a.       They purchased through TRM;

       b.       The purchase was financed by BB&T;

       c.       They did not receive a property report prior to the sale; and

       d.       They have rescinded their sales agreement with TRM.

197.    The purchaser Plaintiffs described in Exhibit 75 all have the following facts and circumstances in common:

       a.       They purchased through Infinity Partners;

       b.       The purchase was financed by Carolina First;

       c.       They did not receive a property report prior to the sale; and

       d.       They have rescinded their sales agreement with Infinity Partners.

198.    The purchaser Plaintiffs described in Exhibit 76 all have the following facts and circumstances in common:

       a.       They purchased through TRM;

       b.       The purchase was financed by Carolina First;

       c.       They did not receive a property report prior to the sale; and

       d.       They have rescinded their sales agreement with TRM.

199.    The purchaser Plaintiffs described in Exhibit 77 all have the following facts and circumstances in common:

        a.      They purchased through TRM;

        b.      The purchase was financed by Cooperative Bank;

        c.      They did not receive a property report prior to the sale; and

        d.      They have rescinded their sales agreement with TRM.

200.    The purchaser Plaintiffs described in Exhibit 78 all have the following facts and circumstances in common:

        a.      They purchased through TRM;

        b.      The purchase was financed by Woodlands Bank;

        c.      They did not receive a property report prior to the sale; and

        d.      They have rescinded their sales agreement with TRM.

201.    The purchaser Plaintiffs described in Exhibit 79 all have the following facts and circumstances in common:

        a.      They purchased through Metro;

        b.      The purchase was financed by Essex Bank;

        c.      They did not receive a property report prior to the sale; and

        d.      They have rescinded their sales agreement with Metro.

202.    The purchaser Plaintiffs described in Exhibit 80 all have the following facts and circumstances in common:

        a.      They purchased through Premier;

        b.      The purchase was financed by Essex Bank;

        c.      They did not receive a property report prior to the sale; and

        d.      They have rescinded their sales agreement with Metro.

203.    The purchaser Plaintiffs described in Exhibit 81 all have the following facts and circumstances in common:

        a.      They purchased through Metro;

        b.      The purchase was financed by McQuarie ;

        c.      They did not receive a property report prior to the sale; and

        d.      They have rescinded their sales agreement with Metro.

204.    The purchaser Plaintiffs described in Exhibit 82 all have the following facts and circumstances in common:

        a.      They purchased through Premier;

        b.      The purchase was financed by RBC;

        c.      They did not receive a property report prior to the sale; and

        d.      They have rescinded their sales agreement with Premier.

## COUNT 1 REVOCATION OF CONTRACT PURSUANT TO 15 U.S.C. §1703(c) – REVOCATION WITHIN TWO YEARS → DEVELOPER DEFENDANTS

205.    ILSA §1703(b) provides that a contract may be revoked at the option of the purchaser until midnight of the seventh day following the signing of such contract or agreement or until such later time as may be required pursuant to applicable state statutes. 15 U.S.C. §1703(c) provides that:

> (i) "in the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right."

206.     It is uncontested that none of the contracts executed by these Plaintiffs contained the notice that the individual Plaintiffs had a right to revoke as required by ILSA.

207.     It is uncontested that none of the contracts executed by these Plaintiffs included a Property Report.  Even if Plaintiffs had received a Property Report, which is denied, the Property Report was fatally flawed for the failure of the Defendants to provide material facts about the transaction required to be disclosed pursuant to 15 U.S.C. §1703 (a)(1)(B).

208.     Each of the Plaintiffs is entitled to revoke and did revoke their contracts for the property purchased in the Subdivisions pursuant to 15 U.S.C. §1703(c), because the Developer Defendants failed to provide the Plaintiffs with a Property Report pursuant to 15 U.S.C. §1703(a)(1)(B), and because the sales contract did not set forth that right.

## COUNT 2 REVOCATION OF CONTRACT PURSUANT TO 15 U.S.C. §1703(c) – REVOCATION WITHIN THREE YEARS → DEFENDANT DEVELOPER

209.     Plaintiffs re-allege and incorporate all prior paragraphs.

210.     None of the contracts for the sale of real property between the Developer Defendants and the Plaintiffs listed contained the right to revoke set forth in 15 U.S.C. §1703(b).

211.     None of the contracts for the sale of real property between the Developer Defendants and the Plaintiffs contained the aforementioned right to revoke set forth in 15 U.S.C. §1703(c).

212.     None of the Plaintiffs received a Property Report as required by 15 U.S.C. §1703(a)(1)(B).

213.     Under 15 U.S.C. §1703(c), the Plaintiffs are entitled to revoke the contracts for the purchase of the properties, because of the Developer Defendants' failure to provide them with a Property Report prior to the signing of the contract for the purchase of the property in the Subdivisions, and because the sales contract did not provide that right.

214.    The Plaintiffs revoked their contracts within three years of their signing the contracts or, if there was no contract, within three years of settlement.

215.    Because the contracts of the Plaintiffs did not provide the right to revoke under 15 U.S.C. §1703(c), the Plaintiffs were not aware of that right.

216.    Each of the Plaintiffs sent a letter of revocation by to the Developer Defendants, revoking their purchase of properties in the Subdivisions and requesting the return of all monies related to the purchase of their property.

217.    The Developer Defendants have failed to accept each of the revocations of the Plaintiffs of their purchase of properties in the Subdivisions.

218.    Each of the Plaintiffs revoked their contracts for the property purchased in the Subdivisions pursuant to 15 U.S.C. §1703(c), because the Developer Defendants failed to provide the Plaintiffs with a Property Report pursuant to 15 U.S.C. §1703(a)(1)(B) and the sales contract did not provide that right.

## COUNT 3 DAMAGES PURCHASE TO THE INTERSTATE LAND SALES FULL DISCLOSURE ACT➔ DEVELOPER DEFENDANTS

219.    Plaintiffs re-allege and incorporate all prior paragraphs.

220.    15 U.S.C. §1703(a)(2)(A) makes it unlawful, with regard to sales subject to its requirements, for a developer to employ any device, scheme, or artifice to defraud.

221.    15 U.S.C. §1703(a)(2)(B) makes it unlawful, with regard to sales subject to its requirements, for a developer to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements not misleading, with respect to any information pertinent to the lot or subdivision.

222. 15 U.S.C. §1703(a)(2)(C) makes it unlawful, with regard to sales subject to its requirements, for a developer to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon purchaser.

223. Under 15 U.S.C. **§**1701-5, a "developer" includes any person who, directly or indirectly, sells or offers to sell or advertises for sale any lots in a subdivision; and an "agent" includes any person who represents, or acts for or on behalf of, a developer in selling or offering to sell lots in a subdivision.

224. Under 15 U.S.C. §1701(1)(6), an "agent" includes any person who represents, or acts for or on behalf of, a developer in selling or offering to sell lots in a subdivision.

225. Summerhouse and Cannonsgate, are "Subdivisions" as defined by 15 U.S.C. §1701(3).

226. Craven's Grant is a "subdivision" as defined by 15 U.S.C. §1701(3).

227. All Developer Defendants are statutory "developers" and/or are a statutory "agents" for the Subdivisions under ILSA.

228. An underlying purpose of ILSA is to ensure that a buyer, prior to purchasing certain kinds of real estate, is informed of facts which will enable him or her to make an informed decision about purchasing the property.

229. Pursuant to 15 U.S.C. §1703(a)(1)(B), all purchasers of property that are not exempt under ISLA, are to have receive a Property Report that complies with 15 U.S.C. §1707 prior to the signing of a contract for the purchase of property.

230. None of the lots in the Subdivisions are exempt under ILSA.

231. None of the Plaintiffs received a Property Report as required by 15 U.S.C. §1703(a)(1)(B).

232.     ILSA required the Developer Defendants to provide Property Reports to all of the Plaintiffs.

233.     24 C.F.R. §1715.20 makes it unlawful for any developer or agent, directly or indirectly, to engage in unlawful sales practices, including (i) giving a contract to a purchaser or asking the purchaser to sign anything before delivery of the Property Report; (ii) making any representation that could result in the denial of a right to revoke the transaction; and (iii) representing that the lot has good investment potential.

234.     24 C.F.R. §1715.25 makes it unlawful for any developer or agent to engage in misleading sales practices, including representing that a resell or repurchase program is in place, unless an ongoing program is in existence.

235.     The Developer Defendants violated the provisions of 24 C.F.R. §1715.20 and §1715.25 by giving contracts to some Plaintiffs or asking Plaintiffs to sign documents before delivery of the Property Report representing to Plaintiffs that properties sold to them in the subdivision(s) had good investment potential, and representing to some Plaintiffs that a resell or repurchase program was in place, when no ongoing resell or repurchase program existed.

236.     As a result of Developer Defendants' violations of ILSA and the HUD regulations issued there under, the Plaintiffs were damaged in the amount of (i) the difference between the purchase prices of the properties purchased in the subdivisions and the true fair market value; (ii) the carrying costs of the properties purchased in the subdivisions, (iii) the costs of defending foreclosure actions with respect to the lots, and (iv) in some cases, damage to Plaintiff's credit scores impairing their ability to obtain mortgage financing in the future

### COUNT 4 NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT→ALL DEFENDANTS

237.     Plaintiffs re-allege and incorporate all prior paragraphs.

238. The purpose of the North Carolina Unfair and Deceptive Trade Practices Act N.C. GEN. STAT. §75-1. *et seq.* ("N.C. UDTPA") is "[T]o declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business and between persons engaged in business and the consuming public within this State to the end that good faith and fair dealings between buyers and sellers at all level[s] of commerce be had in this State." *Bhatti v. Buckland*, 328 N.C. 240, 400 S.E.2d 440 (1991). The statute is designed to protect consumers from all kinds of unfair business activities.

239. The elements of the N.C. UDTPA include: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately causes injury to the Plaintiffs.

240. The N.C. UDTPA defines commerce as any business activity.

241. All Defendants engaged in unfair and deceptive acts by among other things:

     a.     Soliciting and obtaining false appraisals;

     b.     Failing to use truthful and accurate HUD-1 Settlement Statements;

     c.     Failing to use a contract which accurately described the terms of the contract between Seller and the Plaintiffs, especially the financial incentives offered;

     d.     Steering purchasers to select lenders who used corrupt appraisers and who knowingly participated in the overall scheme;

     e.     Falsifying some of Plaintiffs' loan applications;

     f.     Using deceptive and untruthful testimonials;

     g.     Using deceptive and false advertising;

     h.     Misrepresenting the values of properties in Summerhouse and Cannonsgate intentionally to Plaintiffs who purchased property in North Carolina;

     i.     Failing to inform Plaintiffs who purchased property in North Carolina of the actual value of the property in Summerhouse and Cannonsgate;

     j.     Failing to inform Plaintiffs of the amount the Developer Defendant actually paid for property in Summerhouse and Cannonsgate;

k. Misrepresenting that the Developer Defendant received a discounted price by purchasing lots in bulk in Summerhouse and Cannonsgate;

l. Representing to Plaintiffs who purchased property in North Carolina that the properties in Summerhouse and Cannonsgate were good investment properties;

m. Operating as mortgage brokers without a license in violation of the North Carolina Mortgage Lending Act;

n. Operating as real estate agents without a license in violation of the laws of North Carolina;

o. Operating as title insurance agents without a license in violation of the laws of North Carolina;

p. Failing to provide Plaintiffs who purchased property in North Carolina with a Property Report prior to the Plaintiffs signing the contract for the purchase of property; and

q. Failing to provide Plaintiffs who purchased property in North Carolina with notice of their right of revocation in the contract for the purchase of properties in Summerhouse and Cannonsgate.

242. The sale of properties in Summerhouse and Cannonsgate to the Plaintiffs directly affects commerce.

243. Plaintiffs were harmed as a direct result of the actions of all Defendants and were damaged in the amount of (i) the difference between the purchase prices of the properties purchased in Summerhouse and Cannonsgate and the true fair market value; (ii) and the carrying costs of the properties.

244. The actions by all Defendants resulting in the sale of properties in Summerhouse and Cannonsgate were willful.

245. Plaintiffs who purchased in either Summerhouse or Cannonsgate are entitled to treble damages and their attorney fees pursuant to NC UDTPA §75-16.

## COUNT 5 NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT→ DEFENDANT LENDERS

246. Plaintiffs re-allege and incorporate all prior paragraphs.

247. The purpose of the North Carolina Unfair and Deceptive Trade Practices Act N.C. GEN. STAT. §75-1. *et seq.* ("N.C. UDTPA") is "[T]o declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business and between persons engaged in business and the consuming public within this State to the end that good faith and fair dealings between buyers and sellers at all level[s] of commerce be had in this State." *Bhatti v. Buckland*, 328 N.C. 240, 400 S.E.2d 440 (1991). The statute is designed to protect consumers from all kinds of unfair business activities.

248. The elements of the N.C. UDTPA include: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately causes injury to the Plaintiffs.

249. The N.C. UDTPA defines commerce as any business activity.

250. The Defendant Lenders engaged in unfair and deceptive acts by:

a. Intentionally misrepresenting the values of properties in Summerhouse and Cannonsgate to the Plaintiffs;

b. Failing to inform the Plaintiffs of the actual value of the property in Summerhouse and Cannonsgate;

c. Failing to inform the Plaintiffs what each Plaintiff's seller (one of the Developer Defendants) paid for property in Summerhouse and Cannonsgate;

d. Deferring to Defendant Developer's selection of the appraiser of the property instead of selecting an appraiser who would act in accordance with the Uniform Standards of Professional Appraisal Practice.

e. Failing to communicate at all with Plaintiffs/borrowers; and

f. Engaging in improper loan origination, underwriting, and closing procedures.

251. The mortgage loans made by the Defendant Lenders to Plaintiffs directly affects commerce.

252. The Plaintiffs who purchased in either Summerhouse or Cannonsgate were harmed as a direct result of Defendant Lenders' unfair and deceptive acts as described herein.

253. The Plaintiffs who purchased in either Summerhouse or Cannonsgate were damaged in the amount of (i) the difference between the purchase prices of the properties purchased in Summerhouse and Cannonsgate and the true fair market value; (ii) the carrying costs of the properties purchased in Summerhouse and Cannonsgate.

254. The Defendant Lenders actions resulting in the sale of properties in Summerhouse and Cannonsgate to the Plaintiffs were willful.

255. The Plaintiffs who purchased in either Summerhouse or Cannonsgate are entitled to an order awarding treble damages and their attorney fees pursuant to the NC UDTPA §75-16. against Defendant Lenders.

## COUNT 6 SOUTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT→ALL DEFENDANTS

256. Plaintiffs re-allege and incorporate all prior paragraphs.

257. The purpose of the South Carolina Unfair and Deceptive Trade Practices Act S.C. St. §39.5.140 *et seq.* ("S.C. UDTPA") to protect consumers from all kinds of unfair business activities.

258. The elements of the S.C. UDTPA include: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately causes injury to the Plaintiffs.

259. The S.C. UDTPA defines commerce as any business activity.

260. All Defendants engaged in unfair and deceptive acts by among other things:

    a.    Soliciting and obtaining false appraisals;

    b.    Failing to use truthful and accurate HUD-1 Settlement Statements;

    c.    Failing to use a contract which accurately described the terms of the contract between Seller and the Plaintiffs, especially the financial incentives offered;

    d.    Steering purchasers to select lenders who used corrupt appraisers and who knowingly participated in the overall scheme;

e.     Falsifying some of Plaintiffs' loan applications;

f.     Using deceptive and untruthful testimonials;

g.     Using deceptive and false advertising;

h.     Misrepresenting the values of properties in Craven's Grant intentionally to Plaintiffs who purchased property in South Carolina;

i.     Failing to inform Plaintiffs who purchased property in South Carolina of the actual value of the property in Craven's Grant;

j.     Failing to inform Plaintiffs of the amount the Developer Defendant actually paid for property in Craven's Grant;

k.     Misrepresenting that the Developer Defendant received a discounted price by purchasing lots in bulk in Craven's Grant;

l.     Representing to Plaintiffs who purchased property in South Carolina that the properties in Craven's Grant were good investment properties;

m.     Operating as mortgage brokers without a license in violation of the South Carolina Mortgage Lending Act;

n.     Operating as real estate agents without a license in violation of the laws of North Carolina;

o.     Operating as title insurance agents without a license in violation of the laws of South Carolina;

p.     Failing to provide Plaintiffs who purchased property in South Carolina with a Property Report prior to the Plaintiffs signing the contract for the purchase of property; and

q.     Failing to provide Plaintiffs who purchased property in South Carolina with notice of their right of revocation in the contract for the purchase of properties in Craven's Grant.

261.     The sale of properties in Craven's Grant to the Plaintiffs directly affects commerce.

262.     Plaintiffs were harmed as a direct result of the actions of all Defendants and were damaged in the amount of (i) the difference between the purchase prices of the properties

purchased in Craven's Grant and the true fair market value; (ii) and the carrying costs of the properties.

263.  The actions by all Defendants resulting in the sale of properties in Craven's Grant were willful.

264.  Plaintiffs who purchased in Craven's Grant are entitled to treble damages and their attorney fees pursuant to S.C. St. §39.5.140.

<u>**COUNT 7 SOUTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT→ DEFENDANT LENDERS**</u>

265.  Plaintiffs re-allege and incorporate all prior paragraphs.

266.  The purpose of the South Carolina Unfair and Deceptive Trade Practices Act S.C. CODE ANN. §39.5.140 ("S.C. UDTPA") to protect consumers from all kinds of unfair business activities.

267.  The elements of the S.C. UDTPA include:  (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately causes injury to the Plaintiffs.

268.  The S.C. UDTPA defines commerce as any business activity.

269.  The Defendant Lenders engaged in unfair and deceptive acts by:

a.  Intentionally misrepresenting the values of properties in Summerhouse and Cannonsgate to the Plaintiffs;

b.  Failing to inform the Plaintiffs of the actual value of the property in Summerhouse and Cannonsgate;

c.  Failing to inform the Plaintiffs what each Plaintiff's seller (one of the Developer Defendants) paid for property in Summerhouse and Cannonsgate;

d.  Deferring to Defendant Developer's selection of the appraiser of the property instead of selecting an appraiser who would act in accordance with the Uniform Standards of Professional Appraisal Practice;

e.  Failing to communicate at all with Plaintiffs/borrowers; and

f. Engaging in improper loan origination, underwriting, and closing procedures.

270. The mortgage loans made by the Defendant Lenders to Plaintiffs directly affects commerce.

271. The Plaintiffs who purchased in Craven's Grant were harmed as a direct result of Defendant Lenders' unfair and deceptive acts as described herein.

272. The Plaintiffs who purchased in Craven's Grant were damaged in the amount of (i) the difference between the purchase prices of the properties purchased in Craven's Grant and the true fair market value; (ii) the carrying costs of the properties purchased in Craven's Grant.

273. The Defendant Lenders actions resulting in the sale of properties in Craven's Grant to the Plaintiffs were willful.

274. The Plaintiffs who purchased in Craven's Grant are entitled to an order awarding treble damages and their attorney fees pursuant to the S.C. CODE ANN. §39.5.140 against Defendant Lenders.

## COUNT 8 COMMON LAW FRAUD → ALL DEFENDANTS

275. Plaintiffs re-allege and incorporate all prior paragraphs.

276. The Defendants falsely represented and concealed material facts relative to the purchase of the lots.

277. The Defendants reasonably calculated that the aforementioned misrepresentations would deceive Plaintiffs, because had Plaintiffs been aware of these misrepresentations, there is no question that they would not have invested in this scheme.

278. The Defendants made the aforementioned misrepresentations with the intent of deceiving Plaintiffs.

279.    Plaintiffs were, in fact, deceived by the aforementioned misrepresentations made by the Defendants.

280.    Plaintiffs could not discover the truth about the condition and true nature of their investments by exercise of reasonable diligence.

281.    Plaintiffs were induced to forego additional investigation of their investments by the Defendants' misrepresentations.

282.    Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' fraudulent misrepresentations relative to the purchase of lots in question, and have suffered financial loss in an amount to be determined by the trier of fact.


## COUNT 9 FRAUD IN THE INDUCEMENT➔ ALL DEFENDANTS

283.    Plaintiffs re-allege and incorporate all prior paragraphs.

284.    The Defendants made false representations or concealed material facts that they had a duty to disclose, relative to the purchase of lots and thereafter failed to do so.

285.    These false representations are directly related to each of the transactions which collectively comprise the purchase of the lots in question.

286.    The Defendants made these representations intending to deceive Plaintiffs.

287.    Plaintiffs reasonably relied on the representations and acted upon them by entering into the purchase of lots.

288.    Due to the existence of the fraud, induced by the Defendants, to the detriment of Plaintiffs, the purchase of lots and the mortgage used to finance that purchase lacks mutuality, and is therefore unenforceable against Plaintiffs.

289.     Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' fraudulent inducements relative to the Investment Contract in question, and have suffered financial loss in an amount to be determined by the trier of fact.

## COUNT 10 CONSTRUCTIVE FRAUD➔ ALL DEFENDANTS

290.     Plaintiffs re-allege and incorporate all prior paragraphs.

291.     The Defendants created a relationship of trust and confidence with Plaintiffs relative to Plaintiffs' participation in the purchase of lots.

292.     The Defendants took advantage of the position of trust in order to benefit themselves, by proffering a number of misrepresentations intended to deceive Plaintiffs with respect to the purchase of lots.

293.     Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' constructively fraudulent misrepresentations relative to the purchase of lots in question, and have suffered financial loss in any amount to be determined by the trier of fact.

## COUNT 11 BREACH OF FIDUCIARY DUTY ➔ ALL DEFENDANTS

294.     Plaintiffs re-allege and incorporate all prior paragraphs.

295.     There existed a fiduciary relationship between Plaintiffs and the Defendants because of, but not limited to, the following:

        a.     At all times relevant thereto, there was a special confidence reposed in the Defendants by Plaintiffs;

        b.     The Defendants, in equity and good conscience, were bound to act in good faith and with due regard to the interests of Plaintiffs with respect to the Investment Contract in question; and

        c.     The reposition of confidence on the part of Plaintiffs, in the Defendants, resulted in domination and influence of Plaintiffs, by the Defendants.

296.     Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' breach of fiduciary duty relative to the purchase of lots in question, and have suffered financial loss in any amount to be determined by the trier of fact.

## COUNT 11 NEGLIGENT MISREPRESENTATION → ALL DEFENDANTS

297.     Plaintiffs re-allege and incorporate all prior paragraphs._

298.     Plaintiffs justifiably relied on the misrepresentations of the Defendants, relative to the purchase of the lots in question.

299.     The materials and information assembled to proffer the negligent misrepresentations to Plaintiffs were prepared without reasonable care.

300.     As fiduciaries of Plaintiffs, the Defendants owed the Plaintiffs a duty of care.

301.     Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' negligent misrepresentations relative to the purchase of lots in question, and have suffered financial loss in an amount to be determined by the trier of fact.

## COUNT 12 VIOLATION OF THE MORTGAGE LENDING ACT (N.C. GEN. STAT. §53-243) → ALL DEFENDANTS

302.     Plaintiffs re-allege and incorporate all prior paragraphs.

303.     Defendants have misrepresented or concealed the material facts surrounding the purchase of the lots in question, and have made false promises likely to influence, persuade, or induce Plaintiffs, as applicants for mortgage loans, to pursue a course of misrepresentation, with respect to the nature and condition of the investments relative to the purchase of lots in question, through agents or otherwise.

304.     By misrepresenting the nature and condition of the value of the lots Plaintiffs' purchased, the Defendants have engaged in transactions, practices, or courses of business that are not in good faith or fair dealing, or that constitute fraud upon Plaintiffs, in connection with the brokering, making, purchase or sale of, mortgage plans.

305.     Plaintiffs purchasing in Summerhouse or Cannonsgate have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' violation of N.C. GEN. STAT. §53-243, and have suffered financial loss in an amount to be determined by the trier of fact.

### COUNT 13 VIOLATION OF THE LICENSING REQUIREMENT ACT (S.C. CODE ANN. §40-58-10) → MARYVILLE

306.     Plaintiffs re-allege and incorporate all prior paragraphs.

307.     The Licensing Requirements Act of Certain Brokers of Mortgages , S.C. CODE ANN. §40-58-10 governs the conduct of mortgage lenders in South Carolina, as more fully set forth in the statute.

308.     S.C. CODE ANN. §40-58-70 prohibits, among other things, misrepresenting the material facts or making false promises likely to influence, persuade, or induce an applicant for a mortgage or a mortgagor to take a mortgage.

309.     Defendant Maryville has misrepresented or concealed the material facts surrounding the purchase of lots in question, and has made false promises likely to influence, persuade, or induce Plaintiffs, as applicants for mortgage loans, to pursue a course of misrepresentation, with respect to the nature and condition of the investments relative to the purchase of lots in question, through agents or otherwise.

310.     By misrepresenting the nature and condition of the value of the lots Plaintiffs' purchased, the Defendants, Maryville has engaged in transactions, practices, or courses of

business that are not in good faith or fair dealing, or that constitute fraud upon Plaintiffs, in connection with the brokering, making, purchase or sale of, mortgage plans.

311.    Plaintiffs who purchased in Craven's Grant have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' violation of S.C. CODE ANN. §40-58-70, and have suffered financial loss in an amount to be determined by the trier of fact.

## COUNT 14 CIVIL CONSPIRACY → ALL DEFENDANTS

312.    Plaintiffs re-allege and incorporate all prior paragraphs.

313.    Plaintiffs further incorporate herein the allegations contained in the preceding paragraph which are made part and parcel of this Cause of Action for Civil Conspiracy.

314.    The Defendants agreed and schemed between themselves to deceive Plaintiffs, relative to the condition and nature of Plaintiffs' investments in the purchase of lots in question.

315.    The purpose of the agreement and scheme between Defendants to deceive Plaintiffs, relative to the condition and nature of Plaintiffs' purchase of lots, was to further the unlawful ends of committing fraud upon Plaintiffs, and breaching their fiduciary duties toward Plaintiffs.

316.    The Defendants conceived of and implemented a common scheme to engage in the conduct complained of herein, in furtherance of the agreement to injure Plaintiffs relative to the condition and nature of Plaintiffs' purchase of lots.

317.    Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' conspiracy to defraud Plaintiffs and to breach their fiduciary duties owed Plaintiffs, relative to the purchase of lots in question, and have suffered financial loss in an amount to be determined by the trier of fact.

## COUNT 15 NEGLIGENCE AS TO ALL LENDER DEFENDANTS

318.    Plaintiffs re-allege and incorporate all prior paragraphs.

319.    The Lender Defendants owed certain duties to their respective borrowers to act in a reasonable manner and to provide services with the degree of skill, care, knowledge and expertise as any other similarly situated mortgage lender.

322.    The Lender Defendants breached those duties to the Plaintiffs herein by way of example and not limitation:

      a.    Intentionally misrepresenting the values of properties in to the Plaintiffs;

      b    Failing to inform the Plaintiffs of the actual value of the property;

      c    Failing to inform the Plaintiffs what each Plaintiff's seller (one of the Developer Defendants) paid for property;

      d    Deferring to Defendant Developer's selection of the appraiser of the property instead of selecting an appraiser who would act in accordance with the Uniform Standards of Professional Appraisal Practice;

      e    Failing to communicate at all with Plaintiffs/borrowers; and

      f    Engaging in improper loan origination, underwriting, and closing procedures.

323.    As a direct and proximate result of the negligence of the Lender Defendants the Plaintiffs have suffered damages.

## COUNT 16 DECLARATORY RELIEF AGAINST HOA

324.    Plaintiffs re-allege and incorporate all prior paragraphs.

325.    This Count is before the Court pursuant to 28 U.S.C. §2201, *et seq.* (2009), the Declaratory Judgment Act. which vests a district court with discretion in determining whether to proceed with a declaratory judgment action. Here, this Court should exercise its discretion to proceed with a declaratory judgment action when the judgment sought will (1) serve a useful

purpose in clarifying and settling the legal relations in issue, and (2) terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

326.    The issue presented here is whether or not the HOA can enforce the terms of a homeowners association agreement that was never disclosed to, nor agreed to, by the Plaintiffs prior to the purchase of their property.

327.    RAN and Maryville had actual knowledge that the flip sales complained of herein were taking place and that none of the other Developer Defendants were purchasing the lots to hold for any period of time.

328.    ILSA requires that the seller of property give a Property Report to the buyer before closing.

329.    The existence of the HOA is not described in any of the sales or promotional materials provided by the developers.  Instead, it is only disclosed in the Property Report.  It is uncontested that neither Maryville nor RAN provided a property report to the Plaintiffs. It is uncontested that none of the other developers gave the Property Report to the Plaintiffs. Therefore, Plaintiffs were not aware of the HOA prior to or at the time of the closing. Moreover, and without exception, the Plaintiffs did not bargain for and did not agree, in advance, to their membership in an HOA nor did any document anywhere identify the obligation to join such an organization.

330.    Each HOA claims the right to collect "fees" or "dues" from the Plaintiffs arising out of the ownership of a lot in each of the developments, respectively. The failure to pay the dues can and does result in the imposition of liens against the property or law suits to enforce and collect the fees alleged to be owed pursuant to the "agreement" of the parties.

331.	The imposition of additional dues or fees to be paid by the Plaintiff(s) to an HOA was never a bargained for term within the contract for the sale of the property.  Indeed, at no time did the Plaintiff(s) know about the HOA in advance of the purchase so as to provide the Plaintiffs with the opportunity to decline to purchase their property.

332.	The HOA's announced their existence to the Plaintiffs after the closing and then only by way of an introductory letter explaining the obligation to pay annual dues ranging from $900 to over $3000.

333.	Some of the Plaintiffs have paid dues or fees to the HOA, notwithstanding the absence of an expressed or implied contract binding them to do so, and have done so out of fear that legal action, or the imposition of a lien, will result.

334.	At all times relevant hereto, RAN and Maryville knew the Defendant Developers were not the ultimate purchaser but instead were flipping the properties at closing and using funds from the Plaintiffs to accomplish the sale between RAN or Maryville and the Defendant Developers.

335.	At all times relevant hereto, RAN and Maryville knew that the Defendant Developers were making certain claims to Plaintiffs that the Defendant Developers were the owners of lots acquired from RA or MP at "wholesale" prices or that the Defendant Developers held options to purchase lots from RA.

336.	At all times relevant hereto, RAN and Maryville knew that the representations made by the Defendant Developers regarding ownership of the properties they intended to sell to Plaintiffs were untrue.

337.	RAN and Maryville utilized the services of their marketing agent, Southeastern, to promote the sale of property to Plaintiffs.  RAN and Maryville each and Southeastern, in turn,

participated and assisted in the promotions, open house(s) and seminars conducted by each of the Defendant Developers.

338.     By virtue of the foregoing, there is no contract between the HOA and these Plaintiffs that this Court can enforce.  The parties have never had a meeting of the minds for the purpose of the formation of such an agreement and payments, if any, were only made by coercion and threats.  It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement. To be enforceable, the terms of a contract must be sufficiently definite and certain. Here, there is no meeting of the minds and therefore no contract.

339.     The transaction creating the obligation for HOA dues and fees is void and unenforceable for the failure of the Defendant Developers to deliver the Property Report as required by ILSA.

340.     Even if the parties had reached an agreement, which Plaintiffs deny as untrue, the HOA is in breach of its obligations because the proposed work to be done in the developments has not been completed within the time for performance.

WHEREFORE, Plaintiffs pray for a judgment:

A.      Awarding Plaintiffs compensatory damages, punitive damages, attorney's fees, and all litigation costs;

B.      Awarding Plaintiffs pre-judgment and post-judgment interest as provided by law;

C.      Entering Declaratory Relief in favor of Plaintiffs and against the HOA that there is no valid, enforceable contract between these parties; and

D.      Awarding such other and further relief as may be just and proper.

**Respectfully submitted,**

**GIARMARCO, MULLINS & HORTON, P.C.**

By: /s/ David A. Binkley

DAVID A. BINKLEY (P31643)
Attorney for Plaintiffs
101 W. Big Beaver Road, Tenth Floor, Columbia Center
Troy, MI 48084-5280
248.457.7000
LR 83.1 Counsel

**THE O'CONNOR LAW FIRM, PLLC**

By /s/ John S. O'Connor
JOHN S. O'CONNOR (#37832)
309 S. Laurel Avenue, Ste. 100
Charlotte, NC 28207
704.919.1885
John@joconnorlaw.com
State Bar No. 37832

Dated: _____, 2009

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues that may be so tried.

**Respectfully submitted,**

**GIARMARCO, MULLINS & HORTON, P.C.**

By: /s/ David A. Binkley
DAVID A. BINKLEY (P31643)
Attorney for Plaintiffs
101 W. Big Beaver Road
Tenth Floor, Columbia Center
Troy, MI 48084-5280
248.457.7000

**THE O'CONNOR LAW FIRM, PLLC**

By /s/ John S. O'Connor
JOHN S. O'CONNOR (#37832)
309 S. Laurel Avenue, Ste. 100
Charlotte, NC 28207
704.919.1885
John@joconnorlaw.com
State Bar No. 37832
LR 83.1 Counsel

Dated: August 31, 2009